## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>PIPELINE HEALTH SYSTEM, LLC., *et al.*,<br><br>   Debtors. | Chapter 11<br><br>Case No. 22-90291 (MI)<br><br>(Jointly Administered) |
| TENET BUSINESS SERVICES CORPORATION, *et al.*,<br><br>   Plaintiffs,<br><br>v.<br><br>SRC HOSPITAL INVESTMENTS II, LLC, *et al.*,<br>   Defendants. | Adv. No. 23-03078 (lead case) *consolidated with* Adv. Nos 23-03079, 23-03080, 23-03081 and 23-03082 |

## <u>DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR DISCOVERY CONFERENCE</u>

Pursuant to paragraph 2 of the Court's Case Management Order (Doc. 120), Defendants SRC Hospital Investments II, LLC ("SRC"); River Forest Property Holdings, LLC; Weiss MOB Property Holdings, LLC; Weiss Property Holdings, LLC; and West Suburban Property Holdings, LLC (collectively "***Defendants***") hereby submit their response in opposition to the emergency motion for discovery conference filed by Plaintiffs Tenet Business Services Corporation; VHS Acquisition Subsidiary Number 3, Inc.; Lakefront Medical Associates, LLC; Vanguard Medical Specialists, LLC; VHS West Suburban Medical Center, Inc.; VHS Acquisition Subsidiary Number 4, Inc., MacNeal Physicians Group, LLC; VHS Westlake Hospital, Inc.; and Midwest Pharmacies, Inc. (collectively, "***Tenet***") (Doc. 119).

The facts underlying this discovery dispute began long before the instant adversary proceeding.  In October 2022, Pipeline Health System, LLC ("***Pipeline***"), along with Defendants (collectively the "***debtors***"), began the court-approved process to sell Weiss Hospital and West

Suburban Medical Center (the "***Chicago Hospitals***") to Ramco Healthcare Holdings, LLC. ("***Ramco***"). Pipeline is Defendants' parent company and *not* a party to the adversary proceeding. Per the terms of that court-approved sale, memorialized in the Membership Interest Purchase Agreement ("***MIPA***"), virtually all facets of the Chicago Hospitals' operations were turned over to Ramco, including the finance and accounting departments, records, and data storage systems. Ramco warranted in the MIPA that it would preserve those records for Defendants for use in future litigation. As a creditor in the bankruptcy proceeding, Tenet knew this, did not object to the sale or to Ramco's taking possession of the property, and did not apprise Defendants that it would be pursuing this adversary proceeding.

Now, based on an unsubstantiated hunch that Defendants *may* have received CMS settlement payments during bankruptcy, Tenet demands Defendants produce records that likely do not exist. Defendants went above the call of duty to retrieve documents they do not have, and, after an exhaustive wild goose chase, nothing has surfaced to corroborate Tenet's belief that these records exist or that Defendants ever received any monies. Yet because Defendants cannot produce documents that do not exist, Tenet insists Defendants are hiding something. That makes no sense.

Defendants have undertaken exhaustive efforts to locate records. On the other hand, Tenet has sat back and done nothing but disingenuously point fingers and fabricate a controversy. Tenet has not issued its own subpoenas. It has not submitted its own FOIA requests. It has not deposed anyone from the entities that currently own and manage the Chicago Hospitals. The only thing Tenet has done is depose Robert Allen, CEO of third-party Pipeline, who testified that any documents Defendants had are in the Chicago Hospitals per the MIPA's terms. Defendants are not "hiding the ball" and have been compliant with their discovery obligations—going above and beyond, in fact, to locate documents Tenet never bothered to subpoena itself.

2

## **Defendants' Efforts to Obtain Responsive Documents**

At the heart of this discovery issue are three allegedly "missing" document categories: (1) NPR letters for the Weiss Hospital cost-reporting periods ending in 2013 and 2014; (2) NPR letters for the West Suburban cost-reporting period ending in 2015; and (3) remittance advices for deposits of the 13 Specified Seller Agency Settlements listed in the complaint (Doc. 1, ¶ 34). Defendants provide the following brief background of the discovery process thus far for the Court's consideration.

On *October 2, 2022*, the debtors filed for bankruptcy and immediately initiated an urgent sale of the Chicago Hospitals to Ramco to avoid liquidating the entire Pipeline entity. On December 2, 2022, this Court approved the sale to Ramco, which included the transfer of the Chicago Hospitals' operations systems, property, personnel, and *all records*—the production of which is the issue Tenet now complains of.  Defendants no longer possess the records—as explained to Tenet in discovery and as specified in the MIPA when the Chicago Hospitals were sold.

Tenet was aware of this sale as it was occurring, evidenced by Tenet's own Exhibit A. It was aware Ramco would immediately take over operations from Defendants. Perhaps most importantly, Tenet knew about the terms of the MIPA, including that Section 8.2 required Ramco to preserve records for Defendants in the event of litigation. Yet Tenet did not raise concerns that Ramco was taking possession of the records it is looking for now, nor did it object to the sale based on document preservation. Critically, this adversary proceeding is **not** listed as threatened or pending litigation under the MIPA, and Tenet had every opportunity to insist on its inclusion. (*See* Case No. 22-90291, Doc. 534, § 3.12 at p. 45-46; Sched. 3.12 at p. 208.)

On *August 31, 2023*, as Federal Rule of Civil Procedure 26(a) required, Defendants

produced nearly 2,000 pages to Tenet in its Initial Disclosures, which included audit adjustment reports, cost reports, notices of program reimbursement ("*NPR*"), and NPR letters for the Chicago Hospitals for various fiscal years from 2013 to 2019. These were the documents Defendants located in their possession after a reasonable and diligent search; they included documents Pipeline received from its current cost report vendor, after Pipeline requested them.

On *September 19, 2023*, Tenet served its document requests. Defendants dispute Tenet's characterization of these requests as seeking "Key Documents" discussed with the Court at the Rule 26(f) conference. The parties' Joint Report specifically enumerated the following "Key Documents": (1) notices of Seller Agency Settlements from CMS and/or NGS; (2) related remittance advices; (3) bank statements reflecting the deposit of Seller Agency Settlements; and (4) bank statements reflecting the flow of Seller Agency Settlement payments out of those accounts. (Doc. 77 at p. 5.) As discussed below, the Master Concentration Account[1] does not fall into these categories.

On *October 19, 2023*, after confirming the Initial Disclosures contained all documents in their possession, Defendants served their discovery responses, which are attached as **Exhibit B**. Because Tenet largely requested financial records, Defendants objected that the requests sought documents containing "confidential or competitively sensitive proprietary information". *See* **Exh. B** at 2. (Tenet is now alleging Defendants did not assert these confidentiality objections – which is false.)  Except for Request No. 3, which sought the Master Concentration Account statements, Defendants responded that the documents were no longer in Defendants' possession, custody, or

---

[1] The Master Concentration Account is the general master account of third-party debtor Pipeline. The Master Concentration Account ending in -2515 is attached as **Exhibit A-1**. In the interest of transparency, other deposit accounts maintained by Pipeline are attached for the Court's consideration. Account -4491 is attached as **Exhibit A-2**, account -4509 is attached as **Exhibit A-3**, account -4517 is attached as **Exhibit A-4**, account -8646 is attached as **Exhibit A-5**, and account -8661 is attached as **Exhibit A-6**.

control but informed Tenet where responsive documents could be located.[2]

On *November 3, 2023*, in efforts above and beyond their discovery obligations, Defendants issued subpoenas to the following entities to locate documents that *Tenet* was looking for: (1) National Government Services, Inc. ("*NGS*"), the CMS cost report vendor (attached as **Exhibit C-1**); (2) Ramco, which acquired the Chicago Hospitals per the Court-approved MIPA (attached as **Exhibit C-2**); (3) TRE Reimbursement Consulting, Inc. ("*TRE Consulting*"), the Chicago Hospitals' former cost report vendor (attached as **Exhibit C-3**); and (4) Resilience Healthcare ("*Resilience*"), which manages the Chicago Hospitals. Defendants issued one subpoena to Resilience at Weiss Hospital (**Exhibit C-4**) and another to Resilience at West Suburban (**Exhibit C-5**), totaling five subpoenas. Tenet has issued zero subpoenas for documents it claims exist.

On *November 29, 2023*, Defendants submitted an expedited Freedom of Information Act ("FOIA") request to CMS, which generally followed the document requests Tenet served on Defendants.[3] A copy of Defendants' FOIA request to CMS is attached as **Exhibit D**. CMS initially objected to the FOIA request but eventually confirmed it located more than 7,600 pages of potentially responsive records. But when Defendants attempted to narrow the massive production to remittance advices and settlement notices specifically, CMS could not confirm whether the 7,600 pages included those documents. *See* **Exh. E**.

On *December 1, 2023*, Tenet sent Defendants a letter to meet and confer on three points: (1) Defendants' legal obligations to obtain documents within their "custody"—i.e., from Resilience/Ramco under Section 8.2 of the MIPA; (2) Defendants' internal search for documents;

---

[2] Defendants objected to Request No. 3 on the grounds the "Relevant Period" term (defined as January 1, 2019 to the present) was overly broad, as explained further in this opposition.

[3] The request lists five overarching categories: (1) cost reports for 2014 to present; (2) NPR reports for 2012 to present; (3) adjustment reports for 2012 to present; (4) NPR letters for 2012 to present; and (5) all correspondence and documents related to cost report settlements, program reimbursements, and remittances dated between January 1, 2019 and present.

and (3) Defendants' objections to Request No. 3 for the Master Concentration Account statements.

On *December 6, 2023*, the parties met and conferred telephonically. During that meeting, Defendants' counsel provided an update on the five subpoenas, advised they submitted a FOIA request to CMS (something Tenet itself could have done), and stated they would issue subpoenas for the Wells Fargo and US Bank accounts sold to Ramco under the MIPA.[4] Defendants' counsel advised it would confirm with third-party Pipeline whether it could access the Master Concentration Account.

On *December 11, 2023*, Defendants issued subpoenas to Wells Fargo (**Exhibit C-6**) and US Bank (**Exhibit C-7**), which produced bank statements on January 30, 2024, and March 1, 2024, respectively. Defendants promptly forwarded the productions to Tenet.

Over numerous telephone calls and emails with Tenet's counsel from December 2023 to February 2024, Defendants' counsel provided nearly weekly discovery status updates—notably, for discovery that was not, since the time the Chicago Hospitals' ownership was transferred, in Defendants' possession. Apparently unsatisfied with Defendants' efforts to obtain documents, and even though Pipeline is ***not a party*** to this adversary action, Tenet noticed the deposition of Pipeline's Rule 30(b)(6) person most knowledgeable, CEO Robert Allen, which took place on March 31, 2024 and April 12, 2024. Tenet apparently disbelieves Mr. Allen's testimony. It depicts him as "wholly unprepared" and unable to respond. Not only does Tenet mischaracterize Mr. Allen's testimony, but it fails to identify what information it hopes to obtain through further depositions or where else responsive documents could be. More importantly, Tenet ignores the fact, explained by Mr. Allen, that the records Tenet seeks (if they ever existed) are with the Chicago

---

[4] Only two Wells Fargo accounts received deposits from CMS directly: the account ending in -0021 received settlements for Weiss Hospital, and -0047 received settlements for West Suburban.

Hospitals. Tenet acknowledges, as it must, the Chicago Hospitals were, in fact, sold—in a manner approved by this Court and known by Tenet at the time—and all assets and records were transferred with the sale.

<strong>Tenet's First Argument:<br><u>Defendants Failed to Preserve Relevant Documents</u></strong>

Tenet points to that very sale as it argues Defendants failed to preserve "relevant documents *upon the Illinois hospital sale* in late November 2022." (Emphasis added.) In the midst of a bankruptcy proceeding, Tenet now claims Defendants should have reasonably anticipated this litigation because of two emails between the parties' counsel in October 2022.[5] (Doc. 119-1 at p.1 ["While…the ultimate determination of property rights may need to be addressed in adversary proceeding…"], and p. 5 ["we are still missing a few pieces of key information on traceability…the Debtors would have to provide this in discovery if we take the only other option suggested by these edits—litigation"].)  Tenet's "may" and "if" in its only two emails undercut its claim Defendants should have reasonably anticipated litigation.

Tenet's spoliation accusations are unfounded. First, Tenet needs to show Defendants had notice of both the claim and the evidence's potential relevance before a duty to preserve arises. *See In re Enron Corp. Securities, Derivative & Erisa Litigation*, 762 F. Supp. 2d 942, 964 (S.D. Tex. 2010). Sanctions for spoliation—"the destruction or the significant and meaningful alteration of evidence"—are only appropriate on a showing of bad faith. *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015), quoting *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010). For electronically stored information, courts require a finding that "the party acted with the intent to deprive another party of the information's use in the litigation." *Eagan v.*

---

[5] These communications took place between bankruptcy counsel in October 2022, long before Defendants' adversary defense counsel became involved.

*Walgreen Co.*, No. 21-20352, 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022), quoting Fed. R. Civ. P. 37(e)(2).

Crucially, the party arguing spoliation must establish that critical evidence existed and was, in fact, lost or destroyed. *See, e.g.*, *In re Delta/AirTran Baggage Fee Antitrust Lit.*, 770 F. Supp. 2d 1299, 1305 (N.D. Ga. 2011) (party seeking sanctions must prove the missing evidence existed, spoliator had a duty to preserve it, and evidence was crucial to proving the case); *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fl. 2010) (movant must show **the missing evidence existed at one time** and spoliator had a duty to preserve it (Emphasis added.)). Speculation about whether the missing evidence existed is insufficient to sustain a spoliation motion. *In re Delta/AirTran Baggage Fee Antitrust Lit.*, 770 F. Supp. 2d at 1309; *Tri-County Motors, Inc. v. American Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007).

Under this standard, Tenet cannot succeed. Defendants dispute that the emails: (1) were intended to apprise Defendants of reasonably anticipated litigation—on their face the emails are conditional and never assert litigation is looming; and they are only two emails in a litany of others in the midst of a bankruptcy proceeding; or (2) conferred on Defendants an obligation to archive copies of "relevant documents"—Tenet never asserted such an obligation and Defendants negotiated, in the MIPA, the right to retrieve documents should they be needed in the future (this is the MIPA provision, discussed below, Defendants have relied upon in seeking information from the Chicago Hospitals). The emails referencing an adversary proceeding expressed nothing more than Tenet's intent to reserve the right to file one. Defendants understood that an adversary proceeding, if any, would involve a dispute over the possession of funds that came into the debtors' possession *after* bankruptcy, and at the time, Tenet had not identified (and still has not) any funds

in the debtors' possession. Now, Tenet seeks records from *during* the bankruptcy, which would have been transferred in the sale to Ramco/Resilience. Tenet never made clear it was initiating litigation in the communications it now relies on.  Debtors' counsel was (1) not aware Tenet was filing an action and (2) focused on completing the sale quickly for the survival of the remaining operations and to prevent liquidation. This Court oversaw the sale to Ramco/Resilience and approved the MIPA's terms. Section 8.2 of the MIPA states in pertinent part:

> The Parties acknowledge that subsequent to the Closing, Seller may need access to information or documents in the control or possession of Buyer for the purposes of…the prosecution or defense of third-party claims. Accordingly, **Buyer shall for a period of seven (7) years after the Closing, and indefinitely with respect to any governmental or third party claims, maintain in accordance with retention requirements under Applicable Law and make reasonably available to Seller and its respective Representatives…such documents and information as may be available relating to the Hospital Facilities** for periods prior to the Closing Date to the extent necessary to facilitate…the prosecution or defense of claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(*See* Case No. 22-bk-90291, Doc. 601, Exh. 1, ¶ 8.2(b), emphasis added.)  In other words, the court-approved MIPA contained an express provision guaranteeing Ramco/Resilience would preserve the records. There was no expectation that, in the midst of a bankruptcy-proceeding-related sale, Defendants would copy, archive, and store all documents potentially relevant to an adversary proceeding that had not even been threatened by one of its creditors.

Moreover, Tenet knew of the sale and made no objection; thus, this Court approved the subject matter, the structure, and the terms of the sale. Tenet was aware Defendants were essentially "turning over the keys" to Ramco/Resilience. Tenet did not raise concerns that Defendants were selling the actual property it is looking for now, nor did it object to the sale out of concerns about document preservation. Ramco/Resilience have produced records on three separate occasions in this case, and Defendants have no reason to believe Ramco/Resilience have

misplaced, destroyed, or otherwise not maintained documents.

Nor has Tenet claimed, or shown, that Defendants purposely destroyed evidence to keep Tenet from using it. *See Guzman*, 804 F.3d at 713; *Eagan*, 2022 WL 683636, at *3. At most, Defendants transferred documents pursuant to the MIPA. Whatever documents existed are with Ramco/Resilience. It is highly likely the documents Tenet seeks for its case never existed—but if they did, Defendants did not destroy them, it just transferred them to Ramco. With no evidence of purposeful destruction, but only a possible "transfer pursuant to MIPA," Tenet has not established a basis for the imposition of sanctions for failure to preserve evidence.

**Tenet's Second Argument:**
**The Parties Cannot Locate Electronically Stored Remittance Advices**

Tenet alleges the "relevant CMS/NGS remittance advices were maintained in an electronic form prior to the sale of the hospitals but cannot be located or obtained." Notably, this is, as Tenet admits, an "allegation." Tenet erroneously assumes the remittance advices in fact exist, and even after Defendants issued five subpoenas, one FOIA request, and contacted its current cost report vendor, nothing has corroborated Tenet's claim. Tenet, too, could have issued subpoenas and a FOIA request if it wants the documents it believes exist—but it did not.

It is important to note where, if anywhere, the documents would be. The Chicago Hospitals each operated as its own business: they had their own finance and accounting departments that were run locally, and they similarly managed local electronic storage systems. While certain operations occurred at the parent level (Pipeline–who is not a party to this action), CMS payments to the Chicago Hospitals did not roll up to Pipeline as a parent. The Chicago Hospitals were each responsible for submitting cost reports to NGS and CMS. And NGS and CMS transmitted documents and correspondence to the Chicago Hospitals directly, which were then stored onsite. Ramco/Resilience's acquisition of the Chicago Hospitals included the finance and accounting

departments *and the documents kept there*. So, Defendants issued subpoenas to Ramco/Resilience for the documents Ramco/Resilience agreed to maintain under the MIPA. Although Ramco/Resilience indicated it searched its systems and located some remittance advices, none appear to correspond directly to the 13 Specified Seller Agency Settlements at issue in this matter.[6] (*See* Doc. 1, ¶ 34.) Ramco/Resilience's communications with Tenet and Defendants' counsel are attached as **Exhibits F-1** and **F-2**.

In January and February 2024, Defendants contacted Pipeline's current cost report vendor, Toyon & Associates, a second time to inquire about documents related to the settlement payments. Toyon searched again and, other than the documents already produced in discovery, indicated it did not locate documents relating to the fiscal years Tenet owned the Chicago Hospitals. *See* **Exhibit G**.

In response to Defendant's FOIA request which matched the language of Tenet's discovery requests—again, a mechanism Tenet could have used but chose not to—CMS eventually confirmed it has more than 7,600 pages of records responsive to the request. Defendants have been communicating with the CMS FOIA coordinator, who requested narrower search terms to better identify potentially relevant records. *See* **Exh. E**. Defendants are currently waiting on the FOIA coordinator to confirm if the narrowed search terms are adequate.

NGS eventually produced approximately 3,000 pages of records, including cost reports, audit adjustment reports, and NPR letters. But the NPR letters and cost reports were duplicates of those the Parties already have, and none of the documents produced resembles a remittance advice.

Notwithstanding that the NPR letters state reimbursement amounts "will be included in a remittance advice within the next 30 days," Defendants have not located a remittance advice that

---

[6] The CMS remittance advices Ramco/Resilience itemize payments by patient, rather than a lump sum payment that could be traced to an NPR letter.

can be tied to the NPR letters or settlement amounts. Nor have NGS, Ramco, Resilience, TRE Consulting, nor Toyon & Associates been successful in identifying *any* remittance advices Tenet alleges exist. Unless the CMS FOIA coordinator can locate remittance advices, the conclusion Defendants draw is they simply do not exist in the form Tenet believes, if at all. Should that be the case, as it appears to be, then the essence of Tenet's argument is that Defendants did not produce documents that never existed. Regardless, if they did exist, they are not now in Defendants possession—they were transferred with the sale.

<b>Tenet's Third Argument:</b><br><b><u>Defendants Failed to Produce the Master Concentration Account Statements</u></b>

Tenet is mistaken in claiming Defendants have failed to produce the Master Concentration Account statements as agreed.

***First***, Defendants did not raise confidentiality as an objection for the first time at Robert Allen's deposition. As noted above, Defendants objected to all of Tenet's requests seeking confidential and proprietary information. *See In re United States*, 864 F.2d 1153, 1156 (5th Cir. 1989) (if a party fails to object timely to production requests, it generally waives those objections). Moreover, Defendants objected specifically to Tenet's Request for Production No. 3 on the grounds the "Relevant Period" encompassed time where the Master Concentration Account was unrelated to the Chicago Hospitals. *See* **Exh. B** at 3. If a party responds to document requests, even if only by objecting, discovery sanctions are not available. *Enron Corp. Savings Plan v. Hewitt Associates, L.L.C.*, 258 F.R.D. 149, 155, n.5 (S.D. Tex. 2009), quoting *Badalamenti v. Dunham's Inc.*, 896 F.2d 1359, 1362 (Fed. Cir. 1990).

***Second***, Tenet falsely portrays Defendants as misrepresenting their willingness to comply to the Court because the Master Concentration Account is at Wells Fargo, not US Bank. (*See* Doc. 119 at p. 2, citing Doc. 102, ¶ 6 [discussing Defendants' efforts to obtain *US Bank* statements

under Rule 45].)  Defendants' representations to the Court about the US Bank subpoenas are entirely unrelated to the Master Concentration Account. Moreover, Tenet omits crucial context for Defendants' "unequivocal statement to this Court": the parties met and conferred telephonically prior to the discovery conference in December 2023. During that conference, Defendants informed Tenet they would subpoena the Chicago Hospitals' accounts at Wells Fargo and US Bank. Defendants' counsel did not represent it would subpoena the Master Concentration Account statements but advised it would confirm whether the non-party Pipeline could access the account.

In January, after confirming Pipeline had access to the account, Defendants explained to Tenet—in an effort to meet and confer further about the Master Concentration Account production—that CMS deposits payments to the Chicago Hospitals into two government-designated Wells Fargo accounts. Before bankruptcy, the account balances were automatically "swept" into a lender account at the end of each day. Between filing the bankruptcy petition on October 2, 2022, and the sale to Ramco on December 2, 2022, those accounts were automatically swept into the Master Concentration Account. The sweeps stopped after Ramco acquired the hospitals and the Wells Fargo accounts.

Because Master Concentration Account statements predating October 2022, before the bankruptcy, would not be relevant for tracing purposes, Defendants proposed deferring producing the Master Concentration Account statements until the parties could determine whether CMS deposited any settlement payments into the Chicago Hospitals' Wells Fargo bank accounts in the relevant timeframe. (*See* fn. 4, *supra*.) From there, Defendants proposed that the parties could agree on a narrowed timeframe for relevant Master Concentration Account statements in an explicit effort to maintain the confidentiality of Pipeline's (again, not a party here) financial information. Tenet did not raise the issue again and has not identified *any* CMS deposits between

October 2, 2022 and December 2, 2022 that would have been "swept" into the Pipeline Master Concentration Account at Wells Fargo, such that the Pipeline Master Account information would even be relevant to this proceeding. As a result, the Pipeline Master Concentration Account statements have no bearing on any issue here, and production violates Pipeline's financial privacy unnecessarily.

Defendants properly asserted its confidentiality objections to these records at the outset. Defendants met and conferred in good faith with Tenet to protect Pipeline's financial privacy by limiting the time period for relevant Master Concentration Account statements. Despite receiving the Chicago Hospitals' Wells Fargo account statements on January 30, 2024, Tenet still has not identified a timeframe during which the Pipeline Master Concentration Account would have received relevant Specified Seller Agency Settlements. Tenet's argument that Defendants have been unwilling to comply is untrue. Nevertheless, in compliance with the Court's Case Management Order, and notwithstanding that there is no prior discovery order compelling production of confidential financial information from third-party Pipeline, the Master Concentration Account bank statements from 2019, 2020, 2022, 2023, and 2024 are attached as **Exhibit A-1**. At the time of filing, Pipeline has been unable to locate bank statements from 2021 but it is continuing to search for them. Defendants request that the Court seal Exhibits A-1 through A-6 and enter a protective order prohibiting the dissemination of the Pipeline deposit account bank records.

**Tenet's Fourth Argument:**
**<u>Defendants' Deponent Was Unable to Testify About Demands to Ramco/Resilience</u>**

Robert Allen's purported inability to testify about discovery demands to Ramco/Resilience is irrelevant. The efforts to obtain Ramco/Resilience's records were between and among the

14

parties' attorneys. Defendants' counsel opted to utilize subpoenas under the Federal Rules of Civil Procedure to maintain transparency in the discovery process—precisely to avoid the allegations Tenet makes now. Defendants and Tenet briefly discussed leveraging business-to-business contacts in December 2023 when Defendants did not receive a response from Ramco/Resilience, to obtain compliance faster than through a noticed motion to compel. But this proved unnecessary. Shortly after the parties participated in the discovery conference with the Court on December 15, 2023, counsel for Ramco/Resilience produced responsive records to the subpoena and pursuant to the MIPA, Section 8.2. Again, to ensure transparency, Defendants connected Tenet's counsel with Ramco/Resilience's counsel. Tenet knew that Defendants were no longer pursuing the business-to-business avenue, as it would have been redundant in light of Ramco/Resilience counsel's involvement and cooperation.

Tenet knew Ramco/Resilience were slow to respond to the subpoenas. But they did ultimately produce records, and Defendants introduced Tenet's counsel to Ramco/Resilience for ease of facilitating the productions. The fact that third-party Pipeline's CEO did not know the intricacies of how the attorneys worked out the issues is irrelevant—and even if he did know, that testimony would require the disclosure of privileged attorney-client communications. Thus, Tenet's complaint that Mr. Allen "could not confirm such demand was made" on Ramco/Resilience—when Tenet knew about the foregoing background—is disingenuous, as Tenet was involved throughout, through its counsel, just as Defendants were involved through theirs. (*See* Doc. 122 at 49:9-16 [testifying that Defendants' counsel was responsible for obtaining records from Ramco/Resilience].)

///

///

15

**Tenet's Fifth Argument:**
**Defendants Have Yet to Examine Their Systems for Key Documents**

Defendants are unsure how Tenet reaches this conclusion. In fact, Tenet requested Defendants to access and search the system known as "FinThrive" for electronic copies of remittance advices. Tenet also suggested Defendants search Iron Mountain, which began storing records in July 2021. As explained above, Defendants have undertaken a diligent effort to locate relevant records that Tenet seeks, and not only have Defendants searched their own records, but they have also issued subpoenas to other entities, to banks, and submitted a FOIA request, all of which Tenet could have done as well. None of the searches found the documents Tenet hoped exist. This is not surprising, as noted above, because Ramco/Resilience assumed possession of the Chicago Hospitals *and their records* on December 2, 2022. Defendants no longer have access to those records—yet Tenet continues to assert Defendants have not searched for key documents. To the extent they exist—and Defendants do not believe they do—they would be with Ramco/Resilience. Searches as to Defendants' still-existing systems were done in the course of this litigation at the direction of Defendants' counsel, as Mr. Allen testified. (*See* Doc. 122, at 116:20–117:24.)

**Tenet's Sixth Argument:**
**Defendants' 30(b)(6) Witness Was Unprepared for Deposition**

Finally, Tenet faults Pipeline's Mr. Allen for being unprepared for deposition. Tenet mischaracterizes his testimony. A party has a duty to make a good-faith effort to designate a knowledgeable representative and to prepare the representative so he can unevasively answer questions about the noticed topics. *Brazos River Auth. v. GE Ionics, Inc.,* 469 F.3d 416, 433 (5th Cir. 2006). A party need not produce its corporate representative with the greatest knowledge about

a subject; instead, it need only produce a person with knowledge whose testimony will be binding on the party.   *Rodriguez v. Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003). As explained, the records Tenet hopes exist all would have been kept locally at the Chicago Hospitals. Those records were transferred—pursuant to the Court-approved MIPA—to Ramco/Resilience. Further, the individuals with the most knowledge of the Chicago Hospitals' financial and accounting departments, as well as recordkeeping, all departed Pipeline and Defendants as part of the same sale in December 2022. Tenet did not object to the sale and did not raise objections to preserve or retain employees who may be able to testify as Pipeline or Defendants' corporate representatives at some future hypothetical time, if and when Tenet filed an adversary proceeding. As of 2023 and 2024, Robert Allen—who was CFO at the relevant times—is the person most qualified to testify about the topics in Tenet's deposition notice.  That does not mean, however, that he knows what, if anything, Ramco/Resilience did with the documents that were transferred as part of the sale. He made this clear in his deposition testimony. (*See* Doc. 122 at 22:6-19, 41:14–42:17; 47:2–49:8, 56:6-14.)

## Conclusion

Tenet has not shown what documents or information the Court can compel, nor if some of the documents it seeks ever even existed, nor in what way Defendants would be subject to sanctions. There is no discovery order in place that would justify the imposition of sanctions under Rule 37. Moreover, given that the discovery conference was already set for May 2, 2024 to address the status of discovery, Tenet's motion is not an emergency at all.

The ultimate question is whether Defendants made a good-faith effort to obtain requested documents not in its possession. *See Battle v. Mineta*, 387 F. Supp. 2d 4, 10, 12 (D.D.C. 2005).

Defendants have done so here. They have cooperated with Tenet and worked diligently and in good faith to obtain what documents do exist from available sources. None of those sources have produced the remittance advices Tenet believes—but offers no evidence to show they do—exist.

Tenet has done nothing to independently source these documents. Defendants subpoenaed third parties Tenet could have subpoenaed. Defendants submitted a FOIA request Tenet could have submitted. Tenet withdrew its deposition subpoena to the entities *actually* in possession of relevant information, and instead deposed someone Tenet knows is not. Then, when Defendants confirmed they have nothing else, Tenet complains Defendants have not produced information that in all likelihood never existed.  If Tenet truly believes these records exist, why did it not subpoena the third parties Defendants originally identified in response to Tenet's discovery? Why did Tenet not submit a FOIA request to CMS? Why did Tenet not depose Ramco/Resilience representatives? Tenet offers no answer and instead accuses Defendants of not doing enough.

Defendants willingly and without opposition produced third-party Pipeline's person most knowledgeable for deposition under Rule 30(b)(6) on March 21, 2024 and April 12, 2024. Defendants' takeaway from the deposition is that, while Tenet assumes certain remittance advices exist, to date Defendants have not located any records that corroborate Tenet's assumption.  Tenet cannot compel the production of records it cannot demonstrate even exist and cannot ask the Court to sanction Defendants after months of exhaustive efforts—especially where there's no showing Defendants destroyed any evidence, only that whatever did exist (along with everything else in the Chicago Hospitals) was simply transferred as part of a Court-approved sale.

Tenet wants Defendants to magically possess documents that do not exist—but that is not the law.  The law deals in reality, and it only requires Defendants to conduct a good faith, diligent search and produce relevant documents it possesses.  Defendants have met this obligation, and

more. The documents Tenet seeks either never existed, or if they did, Defendants, despite a thorough and diligent search, have not located them. There is no conduct here meriting sanctions, except for Tenet's fabricated and baseless claim that an "emergency" exists.

Dated: April 26, 2024

**CARLSON & JAYAKUMAR LLP**

/s/ _Keith W. Carlson_

Keith W. Carlson
   (Cal. Bar 193437 *admitted pro hac vice*)
Lil G. Delcampo
   (Cal. Bar 190055 *admitted pro hac vice*)
Kathrynn F. Benson
   (Cal. Bar 311000 *admitted pro hac vice*)
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660
Telephone:   949-222-2008
Email:      keith@cjattorneys.com
             lil@cjattorneys.com
             kathrynn@cjattorneys.com

*and*

**JACKSON WALKER LLP**
Veronica A. Polnick (TX Bar No. 24079148)
Javier Gonzalez (TX Bar No. 24119697)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:   (713) 752-4200
Facsimile:   (713) 752-4221
Email:      vpolnick@jw.com
             jgonzalez@jw.com

*Co-Counsel for Defendant Debtors*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2024, I caused a true and correct copy of the foregoing to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Kathrynn Benson /
Kathrynn Benson

*Counsel for Defendant Debtors*

13