## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>PIPELINE HEALTH SYSTEM, LLC., *et al.*,[1]<br><br>        Debtors. | Chapter 11<br><br>Case No. 22-90291 (MI)<br><br>(Jointly Administered) |
| TENET BUSINESS SERVICES CORPORATION; VHS ACQUISITION SUBSIDIARY NUMBER 3, INC.; LAKEFRONT MEDICAL ASSOCIATES, LLC; VANGUARD MEDICAL SPECIALISTS, LLC; VHS WEST SUBURBAN MEDICAL CENTER, INC.; VHS ACQUISITION SUBSIDIARY NUMBER 4, INC., MACNEAL PHYSICIANS GROUP, LLC; VHS WESTLAKE HOSPITAL, INC.; AND MIDWEST PHARMACIES, INC.,<br><br>        Plaintiffs,<br><br>v.<br><br>SRC HOSPITAL INVESTMENTS II, LLC; RIVER FOREST PROPERTY HOLDINGS, LLC; WEISS MOB PROPERTY HOLDINGS, LLC; WEISS PROPERTY HOLDINGS, LLC; AND WEST SUBURBAN PROPERTY HOLDINGS, LLC,<br><br>        Defendants. | Adv. No. 23-03078 (lead case), *consolidated with* Adv. Nos 23-03079, 23-03080, 23-03081 and 23-03082 |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Tenet Business Services Corporation, together with the other above-captioned plaintiffs

(collectively, the "***Tenet Entities***"), hereby file this Motion for Summary Judgment pursuant to

---

[1] A complete list of each of the debtors (the "***Debtors***") in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at http://dm.epiq11.com/PipelineHealth. The Debtors' service address is 898 N. Pacific Coast Highway, Suite 700, El Segundo, California 90245.

Rule 7056 of the Federal Rules of Bankruptcy Procedure (the "***Motion***"), and respectfully state as follows:

## PRELIMINARY STATEMENT

This case is about whether the above-captioned defendants (collectively, the "***Defendants***" and with the Tenet Entities, the "***Parties***") entered their Chapter 11 Cases holding funds beneficially owned by the Tenet Entities, and if so, whether that gives rise to an administrative claim in favor of the Tenet Entities. After extensive engagement, the Parties have narrowed the issues by agreeing that the sole issues for the Court to determine are:

> ***Issue 1:*** whether, under the APA and applicable law, the Identified Amounts were subject to an express trust, constructive trust, resulting trust, bailment, or other legal relationship on October 2, 2022 (the "***Petition Date***"), such that one or more Tenet Entities held the beneficial interest in the funds, excluding them from Defendants' bankruptcy estates;

> ***Issue 2:*** whether the Tenet Entities' Tracing Analysis applies and satisfies the tracing requirements, if any, under applicable law to trace the Specified Seller Agency Settlements to funds in the West Suburban Nongovernment Lock Box Account or Weiss Nongovernment Lock Box Account on the Petition Date; [and]

> ***Issue 3:*** whether the Tenet Entities' post-petition conversion claims (if proven by an affirmative ruling on Issue 1 and Issue 2) would be entitled to administrative priority[2] under the Bankruptcy Code.[3]

*See* Second Joint Stipulation of Facts Between Plaintiffs and Defendants (Doc. 158) (the "***Stipulation***") ¶ 12.

The Tenet Entities prevail on each issue for the following reasons:

- ***Issue 1*** – On the Petition Date, the Defendants held the traceable proceeds of the Settlements (defined below) as an agent, bailee, or trustee for the Tenet Entities.

---

[2] The Stipulation contained a typo referencing Section 503(b)(9), a copy-paste error from the Complaint ¶ 52. The Tenet Entities believe that if the Court grants the Tenet Entities leave to amend the Complaint, the Defendants will agree to make a corresponding alteration to the Stipulation. *See* Doc. 159. Otherwise, Plaintiffs will seek relief from the Court. All statements herein with respect to the Stipulation and Section 503(b)(1) should be construed in that light.

[3] Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "***Bankruptcy Code***").

2

- **Issue 2** – The Tenet Entities have traced the proceeds of the Settlements into the Defendants' accounts on the Petition Date. To the extent any further tracing analysis is required, the lowest intermediate balance rule has been properly applied by the Tenet Entities.

- **Issue 3** – Postpetition conversion claims are entitled to administrative priority under the Bankruptcy Code.

Accordingly, the Court should render summary judgment in favor of the Tenet Entities.

## STATEMENT OF FACTS

In 2018 and 2019, SRC Hospital Investments II, LLC ("**SRC**") and the Tenet Entities negotiated and consummated a transaction in which SRC acquired three hospitals and related facilities in the Chicago area: West Suburban Medical Center, Westlake Hospital, and Weiss Memorial Hospital (excluding the Westlake Hospital, the "**Illinois Facilities**"). *See* Defendants' Third Amended Answer, Sept. 19, 2024 [Doc. 146] ("**Answer**") ¶ 23 (admitting Complaint for Conversion, Declaratory Relief, and Turnover of Funds and Application for Injunctive Relief, May 10, 2023 [Doc. 1] ("**Complaint**") ¶ 23).

In connection with the transaction, the Tenet Entities, as sellers ("**Sellers**"), and Defendant SRC, as buyer ("**Buyer**"),[4] executed the Amended and Restated Asset Purchase Agreement, dated December 31, 2018, and the First Amendment to Amended and Restated Asset Purchase Agreement, dated January 28, 2019 (such agreement, as amended, the "**APA**"). Answer ¶ 24 (admitting Compl. ¶ 24). A copy of the APA is attached to the Complaint as Exhibit A. *Id.*

Under Section 2.2 of the APA, the Tenet Entities were to retain certain assets, including the Seller Agency Settlements (collectively, the "**Excluded Assets**"). *See* APA § 2.2(d); Answer ¶ 26 (admitting Compl. ¶ 26). "Seller Agency Settlements," as defined in Section 2.2(d) of the APA

---

[4] For the purpose of this motion, to the extent Defendants other than SRC were assignees of rights under the APA, they are included within the definition of "**Buyer**." *See* APA § 11.5 (allowing the Buyer to assign rights under the APA to wholly owned subsidiaries (each a "**Buyer Subsidiary**")).

(each a "***Settlement***"), are rights to positive cost reports settlements or retroactive adjustments on

Seller Cost Reports[5] for the period prior to "***Closing***" (as defined in the APA), which occurred on

January 28, 2019.[6] The Settlements are entitlements to reimbursements primarily under Title 42

of the United States Code, the statutory provisions governing the relationship of health care

providers and the DHHS. Answer ¶ 27 (admitting Compl. ¶ 27). Each Seller Agency Settlement is

a distinct property interest. *See* Answer ¶ 28 (admitting Compl. ¶ 28).

In accordance with the APA, SRC remitted certain Seller Agency Settlements to the Tenet

Entities on a consistent basis through January 20, 2022. Answer ¶ 32 (admitting Compl. ¶ 32). But

after January 20, 2022, Defendants admit that they stopped remitting Seller Agency Settlements

to the Tenet Entities. Answer ¶ 34 (admitting Compl. ¶ 34). More specifically, Defendants admit

that they failed to remit the "***Specified Seller Agency Settlements***"[7] that are subject to the

Complaint. *Id*.

The Tenet Entities repeatedly demanded the timely remittance of the proceeds of the

Settlements after Closing on the sale of the Illinois Facilities. *See Declaration of Steven Schaefer*

*in Support of Plaintiffs' Motion for Summary Judgment* (the "***Schaefer Decl.***") ¶ 6. For instance,

on June 2, 2021, Beth Sloan, on behalf of the Tenet Entities, emailed Defendants' representatives

a detailed spreadsheet of the amounts due to the Tenet Entities with respect to the May 31, 2016

---

[5] "***Cost Reports***" are defined in the APA as "all cost and other reports filed pursuant to the requirements of Government Reimbursement Programs, and similar of successor programs with or for the benefit of Governmental Authorities for payment or reimbursements of amounts due from them." APA § 1.1; Answer ¶ 26 (admitting Compl. ¶ 26). "***Government Reimbursement Programs***" means "any programs funded or administered by federal or state government, or contractor(s) thereof, for the purposes of paying for health care services. Such programs shall include Medicare, Medicaid, TRICARE, programs administered by the U.S. Department of Labor Employment Standards Administration's Office of Workers' Compensation Programs (e.g., administration of claims pursuant to the Black Lung Benefits Act), and similar or successor programs with or for the benefit of designated federal or state residents." *Id*.

[6] This is also the "***Closing Date***" under the APA.

[7] This term shall have the definition ascribed in the Complaint ¶ 34.

and January 27, 2019 Weiss Cost Reports and April 30, 2016, 2017, and 2018 West Suburban Cost Reports. Schaefer Decl. ¶ 7 & **Exhibit 1-A** attached thereto at Tenet076-Tenet077 (June 2, 2021 email: "List of MEDICARE Cash Received by Pipeline that is owed to Tenet or Tenet owes Pipeline" and requesting status of those funds). On August 2, 2022, Ms. Sloan updated this spreadsheet with the May 31, 2018 Weiss Cost Report and the January 27, 2019 West Suburban Cost Report. *See id.* ¶ 8 & Exhibit 1-A at Tenet062 (August 11, 2022 email: "Have you been able to find out and verify these payments for cost report settlements that are due to Tenet? Please let me know when you can so I can sent [sic] an update on when we will receive these funds.").

On the Petition Date, the Defendants filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court. Answer ¶ 1 (admitting Compl. ¶ 1). After the Petition Date, the Tenet Entities' counsel generally handled the postpetition requests for payment information concerning the Settlements. Tenet Entities' counsel engaged with the Defendants' counsel by both phone and email to seek the return of the Settlement remittances believed to have been paid to Defendants prepetition and relevant information regarding the other Settlements. *Declaration of Jacob A. Johnson in Support of Plaintiffs' Motion for Summary Judgment* ("**Johnson Decl.**") ¶ 6.

At the request of Defendants' counsel, shortly after the Petition Date, Tenet Entities' counsel provided a comprehensive chart to assist the Defendants in evaluating the Tenet Entities' request. *See* Johnson Decl. ¶ 7 & **Exhibit 1-B** attached thereto (October 21, 2022 email correspondence between counsel for Tenet Entities and counsel for Defendants). Given the complexity of the tracing analysis and the urgency of the Defendants' bankruptcy cases, the Tenet Entities agreed to defer this litigation in exchange for reservations of rights culminating in the Plan Reservation of Rights. *See* Confirmation Order ¶ 118 [Chapter 11 Cases Doc. No. 1019]; Johnson

Decl. ¶ 8. There is no dispute that all of the Tenet Entities rights with respect to the Settlements were preserved through the bankruptcy cases. Answer ¶ 2.

The Parties have stipulated the following facts per the Stipulation, which is set forth in relevant part below verbatim:

### Weiss Memorial Hospital Settlements

1.      As detailed more fully in Table 1 below, National Government Services, Inc. ("**NGS**"), on behalf of Centers for Medicare and Medicaid Services ("**CMS**"), deposited four payments corresponding to Specified Seller Agency Settlements for the respective "**Cost Report Period**" (each, a "**Deposit Amount**") into the "Weiss Government Lock Box Account" (Wells Fargo account ending in 0021). Each Deposit Amount was then credited to the "Weiss Nongovernment Lock Box Account" (Wells Fargo account ending in 0039) on the following business day (the "**Sweep Date**").

2.      For each Deposit Amount, (A) the "**Lowest Intermediate Ledger Balance**" column in Table 1 reflects the lowest daily ledger balance between the Sweep Date and October 2, 2022 (the "**Petition Date**"), per the Weiss Nongovernment Lock Box Account bank statements, and (B) the "**Lowest Intermediate Ledger Balance Date**" column in Table 1 reflects the date of such Lowest Intermediate Ledger Balance.

3.      The "running balance" column in Table 1 shows the result of the Tenet Entities' tracing analysis for each Weiss Specified Seller Agency Settlement, calculated as follows: each Deposit Amount is added to the previous traceable amount, if any,[8] set forth in the running balance column, capped by the Lowest Intermediate Ledger Balance corresponding to such deposit (the foregoing methodology, as reflected in Table 1, the "**Weiss Tracing Analysis**").[9]

---

[8] Prior to Weiss June 15, 2021 deposit, the beginning running balance is $0.

[9] For example, the June 15, 2021 Deposit Amount ($91,653.37) is capped by the $62,599.68 February 17, 2022 ledger balance (the lowest daily account balance recorded between June 15, 2021 and October 2, 2022), resulting in the first running balance entry of $62,599.68. By further example, when NGS deposited $4,980.81 for cost report period 2018, the running balance becomes $67,877.59, because $4,980.81 + $62,896.78 = $67,877.59, which is <u>less</u> than the related Lowest Intermediate Ledger Balance ($70,027.94). But when NGS deposited $2,648.09 for cost report period 2019, the resulting sum of $70,525.68 ($67,877.59 + $2,648.09) is capped at $70,027.94, the Lowest Intermediate Ledger Balance for cost report period 2019. Because that is the last Weiss deposit, the $70,027.94 final running balance number would be the traceable amount using Tenet's proposed methodology.

**Table 1**

| Weiss Nongovernment Lock Box Account | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cost Report Period | Amount Claimed in Complaint | Amount Per Remittance Advice | Sweep Date | Deposit Amount | Lowest Intermediate Ledger Balance Date | Lowest Intermediate Ledger Balance | Running Balance |
| 5/31/2016 | $169,063.00 | $169,063.00 | 6/15/2021 | $91,653.37 | 2/17/2022 | $62,599.68 | $62,599.68 |
| 5/31/2014 | $35,627.00 | $35,735.00 | 2/23/2022 | $297.10 | 8/25/2022 | $70,027.94 | $62,896.78 |
| 5/31/2018 | $15,625.00 | $15,625.00 | 8/12/2022 | $4,980.81 | 8/25/2022 | $70,027.94 | $67,877.59 |
| 1/27/2019 | $22,558.00 | $22,558.00 | 8/16/2022 | $2,648.09 | 8/25/2022 | $70,027.94 | **$70,027.94** |

4.      The Weiss Nongovernment Lock Box Account had a balance of $199,552.84 on October 2, 2022.

**West Suburban Medical Center Settlements**

5.      As detailed more fully in Table 2 below, NGS deposited five payments corresponding to Specified Seller Agency Settlements for the respective "***Cost Report Period***" (each, a "***Deposit Amount***") into the "West Suburban Government Lock Box Account" (Wells Fargo account ending in 0047). Each Deposit Amount was then credited to the "West Suburban Nongovernment Lock Box Account" (Wells Fargo account ending in 0054) on the following business day (the "***Sweep Date***").

6.      For each Deposit Amount, (A) the "***Lowest Intermediate Ledger Balance***" column in Table 2 reflects the lowest daily ledger balance between the Sweep Date and the Petition Date, per the West Suburban Nongovernment Lock Box Account bank statements, and (B) the "***Lowest Intermediate Ledger Balance Date***" column in Table 2 reflects the date of such Lowest Intermediate Ledger Balance.

7.      The "running balance" column in Table 2 shows the result of the Tenet Entities' tracing analysis for each West Suburban Specified Seller Agency Settlement, calculated as follows: each Deposit Amount is added to the previous traceable amount, if any,[10] set forth in the running balance column, capped by the Lowest Intermediate Ledger Balance corresponding to such deposit (the foregoing methodology, as reflected in Table 2, the "***West Suburban Tracing Analysis***" and

---

[10] Prior to the June 10, 2021 deposit, the beginning running balance is $0.

collectively with the Weiss Tracing Analysis, the "***Tracing Analysis***").

**Table 2**

| West Suburban Nongovernment Lock Box Account | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cost Report Period | Amount Claimed in Complaint | Amount Per Remittance Advice | Sweep Date | Deposit Amount | Lowest Intermediate Ledger Balance Date | Lowest Intermediate Ledger Balance | Running Balance |
| 4/30/2016 & 4/30/2017 | $109,552.00 & $154,527.00 | $264,079.00 | 6/10/2021 | $165,570.67 | 8/5/2022 | $65,240.90 | $65,240.90 |
| 4/30/2015 | $76,434.00 | $76,434.00 | 2/8/2022 | $42,111.85 | 8/5/2022 | $65,240.90 | $65,240.90 |
| 1/27/2019 | $113,966.00 | $113,966.00 | 4/6/2022 | $1,969.93 | 8/5/2022 | $65,240.90 | $65,240.90 |
| 1/28/2019 | $783,963.00 | $783,963.00 | 5/31/2022 | $361,301.95 | 8/5/2022 | $65,240.90 | $65,240.90 |
| 4/30/2018 | $12,781.00 | $12,781.00 | 8/6/2022 | $9,650.79 | 9/29/2022 | $96,354.69 | **$74,891.69** |

8.      The West Suburban Nongovernment Lock Box Account had a balance of $292,693.67 on the Petition Date.

**General Factual Stipulations**

9.      Defendants received notices of program reimbursement (prior to remittance), remittance advices (prior to remittance), and bank statements (the month of remittance) that collectively provide the ability to identify, by cost report year, the amounts NGS deposited (i.e., the remittances) into the Weiss and West Suburban Government Lock Box accounts, reflected above in Table 1 and Table 2.

10.     Under the Tenet Entities' Tracing Analysis (if applicable and sufficient),[11] the $70,027.94 in the Weiss Nongovernment Lock Box Account and $74,891.69 in the West Suburban Nongovernment Lock Box Account (collectively, the "***Identified Amounts***") are traceable[12] to the Specified Seller Agency

---

[11] For the avoidance of doubt, by Paragraph 10, Defendants are stipulating to the Tenet Entities' tracing explanation only. The Parties are not stipulating that the Tenet Entities' Tracing Analysis (the lowest-intermediate-balance analysis) applies or is satisfied, or that the "daily ledger balance" reported on the subject bank statements is, in fact, the lowest intermediate balance as that term is used in applicable case law. Defendants specifically reserve the right to dispute the foregoing.

[12] By using the terminology "lowest intermediate balance analysis" and "traceable," the Parties are not stipulating that the Specified Seller Agency Settlements and their proceeds are subject to a trust or fiduciary relationship in favor of Plaintiffs, as that is the issue presented to the Court for decision.

Settlements as reflected in Table 1 and Table 2.

Stip. ¶¶ 1-10.[13]

## STIPULATED ISSUES FOR RESOLUTION

In the Stipulation, the Parties have narrowed the issues for the Court, by agreeing that the

sole issues for the Court to determine are:

*Issue 1:* whether, under the APA and applicable law, the Identified Amounts were subject to an express trust, constructive trust, resulting trust, bailment, or other legal relationship on the Petition Date, such that one or more Tenet Entities held the beneficial interest in the funds, excluding them from Defendants' bankruptcy estates;

*Issue 2:* whether the Tenet Entities' Tracing Analysis applies and satisfies the tracing requirements, if any, under applicable law to trace the Specified Seller Agency Settlements to funds in the West Suburban Nongovernment Lock Box Account or Weiss Nongovernment Lock Box Account on the Petition Date; [and]

*Issue 3:* whether the Tenet Entities' post-petition conversion claims (if proven by an affirmative ruling on Issue 1 and Issue 2) would be entitled to priority under section 503(b)(9)[[14]] of the Bankruptcy Code.

Stip. ¶ 12.

To prevail in this action, Plaintiffs must prevail on Issue 1, Issue 2, and Issue 3. Thus, the Parties stipulate: (A) judgment should be awarded in favor of Defendants if Plaintiffs <u>do not</u> prevail on Issue 1, Issue 2, and Issue 3, and (B) judgment should be awarded in favor of Plaintiffs in the amount of the funds found traceable pursuant to Issue 2 if Plaintiffs <u>do</u> prevail on Issue 1, Issue 2, and Issue 3.

Stip. ¶ 13.

The Tenet Entities only seek recovery with respect to the Settlements identified in Tables

1 and 2.

---

[13] Paragraph 11 of the Stipulation addresses Plaintiffs' abandonment of three Specified Seller Agency Settlements, which are not included in Table 1 or Table 2 and are thus not in the definition of Settlements hereunder.

[14] *See* footnote 2.

**ARGUMENT**

The Tenet Entities are entitled to judgment as a matter of law on the stipulated issues submitted for resolution as there is no genuine dispute as to any material fact when viewing the facts in the light most favorable to the Defendants that (1) one or more Tenet Entities held the beneficial interest in the Identified Amounts thereby excluding the funds from Defendants' bankruptcy estates; (2) the Tenet Entities have traced the Settlements into the nongovernment lock boxes; and (3) post-petition conversion claims are entitled to priority under section 503(b)(1) of the Bankruptcy Code.

**A.** **Issue 1: On the Petition Date, the Tenet Entities owned the beneficial interests of the traceable Settlement proceeds; the Settlement proceeds were not part of the Defendants' bankruptcy estates.**

A debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). These "legal and equitable interests" are defined by state law in the absence of controlling federal bankruptcy law to the contrary. *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 435 (5th Cir. 1994); *see also Butner v. United States*, 440 U.S. 48, 55, 59 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

A bankruptcy estate takes only the rights and title in property that the debtor possessed at the commencement of the case. "With regard to property held by the debtor as trustee, 'the rule is elementary that the estate succeeds only to the title and rights in the property that the debtor possessed … . Therefore . . ., the estate will generally hold such property subject to the outstanding interest of the beneficiaries.'" *Ga. Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962, 968 (5th Cir.

1983). "Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own." *In re Quality Holstein Leasing*, 752 F.2d 1009, 1013 (5th Cir. 1985).

Section 541(d) clarifies that "if a debtor holds only legal title and not an equitable interest in property at the commencement of the bankruptcy case, that property becomes property of the estate 'only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.'" *Haber Oil Co.*, 12 F.3d at 435 (quoting Section 541(d)). Section 541(d) excludes the equitable interests in property held by the debtor as trustee, agent, or bailee. 5 *Collier on Bankruptcy* P 541.05 (16th 2024).

Here, the Settlements were not property of the Defendants' bankruptcy estates because the Tenet Entities retained ownership of the Settlements and any rights of the Defendants in the Settlements were either possessory or rights of bare legal as agent, bailor, or trustee.

i.    **The Tenet Entities own the Settlements.**

      ***a.   The APA and applicable state law clearly establish the Tenet Entities' ownership of the Settlements.***

The Settlements are rights under the federal Medicare program. *See generally* 42 U.S.C. §§ 1395c-1395i-5. There is no doubt that the ownership of the Settlements remains with the Tenet Entities under the APA. Under the plain language of the APA, the Tenet Entities retained "**all rights** … relating to" the Settlements. *See* APA § 8.8(a) (emphasis added). Additionally, the APA specifically provides that:

1. Settlements are "Excluded Assets" "not … conveyed" to Buyer. APA § 2.2.

2. "Sellers … retain all rights and liabilities relating to the [Settlements], including the right to appeal any Medicare determinations relating [thereto]." APA § 8.8(a).

3. Buyer agreed to "promptly … remit" the Settlements to the Sellers, APA § 8.6(ii), and in no event later than "ten (10) business days after receipt," APA § 8.8(a).

The Parties agree that the applicable state law governing the assignment of the Provider Agreements[15] and Provider Numbers[16] is either Illinois law (APA choice of law provision Section 11.4 and the location of the Illinois Facilities) or Texas law (the Tenet Entities' principal place of business,[17] and where Defendants, as appointees of this Court, refused to return the Tenet Entities' funds[18]). Whether applying either Illinois or Texas state law, the Tenet Entities prevail.

Where a contract is plain on its face, both Texas and Illinois law will enforce the contract according to its terms. *Kan. City S. Ry. v. Sasol Chems. (USA), L.L.C.*, 113 F.4th 446, 451 (5th Cir. 2024) (applying Texas law, an unambiguous contract "must be enforced as written"); *Abbott v. Amoco Oil Co.*, 249 Ill. App. 3d 774, 785 (Ill. 1993) (Under Illinois law, "an unambiguous contract must be enforced as it is written."). Thus, the Court should hold that legal and equitable title to the Settlements belonged to the Tenet Entities. *See Segal v. Rochelle*, 382 U.S. 375, 384 (1966) (requiring that state law be enforced among private parties with respect to government payments); *Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg.)*, 81 F.3d 592, 597 (5th Cir. 1996) ("Under the terms of the Agreement it is readily apparent that [debtor did not own] the underlying mortgages, and that the funds consisted of mortgage payments, net escrows, outstanding receivables, and unearned fees. … [T]herefore, while [debtor] had legal title to the funds, it was

---

[15] "***Provider Agreements***" shall have the meaning ascribed to it in the APA.

[16] "***Provider Numbers***" shall have the meaning ascribed to it in the APA.

[17] *Reed v. CareCentric Nat'l, LLC (In re Soporex, Inc.)*, 446 B.R. 750, 761 (Bankr. N.D. Tex. 2011) ("Where the loss alleged is a financial one, the location of the plaintiff is more important than that of the defendant, 'as the financial loss involved will usually be of greatest concern there.'").

[18] It is uncontroversial that in the Fifth Circuit debtors-in-possession are treated as being appointees of the bankruptcy court. *See Trahant v. Mintz (In re Roman Cath. Church of the Archdiocese of New Orleans)*, 2023 Bankr. LEXIS 2853, at *27 (Bankr. E.D. La. Nov. 30, 2023). And the Defendants were acting as Court appointees in failing to return the funds at issue here. *See Berleth v. Preferred Ready-Mix, LLC (In re Preferred Ready-Mix, LLC)*, 660 B.R. 214, 221-22 (S.D. Tex. 2024) ("According to the Bankruptcy Court, [the receiver] acted unlawfully by failing to immediately release the property … All of [the receiver's] conduct, whether or not improper, took place while … carrying out the role he was appointed to perform—i.e., to seize and hold onto [debtor's] property.").

holding those funds for the benefit of those to whom the money was owed, and therefore, [debtor] had no equitable interest in the funds transferred.").

ii.   **Any rights of the Defendants in the Settlements were either possessory or rights of bare legal as agent, bailor, or trustee.**

The Settlements were delivered to the Buyer as agent, bailor, or trustee, with the Tenet Entities retaining all equitable interests therein.

a.   *Buyer acted as an agent over the Settlements on behalf of the Tenet Entities.*

Buyer acted as agent for the Tenet Entities because, under the APA, Buyer was required to act at the Tenet Entities' direction with respect to the disposition of the Settlements and was required to promptly remit the Settlements to the Tenet Entities upon receipt. *See* APA § 8.8. Under both Illinois and Texas law, the two key aspects of an agency relationship are: (1) the agent's legal right to bind the principal, and (2) the principal's ability to bind the agent:

> In Illinois, an agency is a consensual fiduciary relationship between two legal entities whereby the principal has the right to control the conduct of the agent and the agent has the power to effect the legal relations of the principal. *State Sec. Ins. Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 630 N.E.2d 940, 945-46, 196 Ill. Dec. 775 (1st Dist. Ill. 1994) (citations omitted). The usual tests of agency are whether the principal has authority control the method or manner of accomplishing a task by the agent, and whether the agent has authority to subject the principal to liability. *Wargel v. First Nat'l Bank of Harrisburg*, 121 Ill. App. 3d 730, 736, 460 N.E.2d 331, 336, 77 Ill. Dec. 275 (5th Dist. 1984). Although existence of an agency relationship is a question of fact, it may be inferred from facts of a particular case. *Lazarus v. Pascucci*, 74 Ill. App. 3d 633, 640, 393 N.E.2d 1074, 1079, 30 Ill. Dec. 727 (1st. Dist. 1979). However, where agency authority has been conferred in writing and there is no dispute concerning the parties relationship, the question becomes one of law. *Regnery v. Regnery*, 211 Ill. App. 3d 607, 613, 570 N.E.2d 557, 561, 156 Ill. Dec. 81 (1st Dist. 1991).

*Greenfield Direct Response v. Adco List Mgmt. (In re Greenfield Direct Response)*, 171 B.R. 848, 855 (Bankr. N.D. Ill. 1994).

> "Under Texas Law, agency is a legal relationship created by the express or implied agreement between the parties, or by operation of law, under which the agent is authorized to act for and on behalf of the principal, and subject to the principal's control." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 269

(5th Cir. 1980). A leading authority on agency has described a principal-agent relationship as follows:

> There is no particular mode or method which must be adhered to in order to create or establish agency. Regardless of the terms used by the parties, or by what name the transaction is designated, if the facts fairly disclose that one party is acting for or representing another, by the latter's authority the agency exists.

WILLISTON ON CONTRACTS, § 35:1 (4th ed. 1999) (citing RESTATEMENT (SECOND) OF AGENCY § 15, (2nd ed. 1958)); *Smith v. Matias (In re IFS Financial Corp.)*, 2007 Bankr. LEXIS 3122, 2008 WL 2778845, at *13 (Bankr. S.D. Tex. Sept. 11, 2007).

*Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 444 (Bankr. S.D. Tex. 2009).

Here, the key aspects of agency are present with respect to the Settlements. *First*, upon the Buyer's receipt of assignment of the Provider Agreements, it became the "provider." As the provider, Buyer – not the Tenet Entities – had the rights under the CMS regulations to participate in CMS's determinations, reconsiderations, hearings, reviews, and appeals, and otherwise pursue collection of the Settlements. *See generally* 42 CFR part 405. *Second*, in taking these actions, Buyer agreed to act at the direction of the Tenet Entities. *See* APA § 8.8(a) (Sellers retain all rights, including rights of appeal; Buyer agrees to not reply to any related correspondence without permission from Sellers; Buyer agrees to "cooperate … in regard to the preparation, filing, handling and appeals"). And the rights to the Settlements were retained by the Tenet Entities. *Id.* Thus, the Buyer had the right to alter the Tenet Entities' legal rights with respect to the Settlement, but at the same time was required to adhere to the directions of the Tenet Entities. *Third*, the Buyer was required to promptly remit to the Tenet Entities any proceeds of the Settlements upon receipt from CMS. *See* APA § 8.6.

Accordingly, the Settlements were held by Buyer as agent for the Tenet Entities under the APA, and the beneficial interests therein did not come into the Defendants' bankruptcy estates.

14

*See, e.g., Greenfield*, 171 B.R. at 858 (property held in an agency capacity does not belong to the agent and beneficial interests therein do not come into the agent's bankruptcy estate).

> **b.  Alternatively, Buyer acted as a bailor over the Settlements on behalf of the Tenet Entities.**

The Buyer also acted as bailor for the Tenet Entities under the APA because it was required to hold and deliver the Settlements to the Tenet Entities upon receipt.  Under both Texas and Illinois law, a bailment occurs when property is temporarily entrusted to a party for a certain purpose, and upon fulfillment of that purpose, the property is delivered to the rightful recipient:

> Texas defines a bailment as "(1) the delivery of personal property from one person to another for a specific purpose; (2) acceptance by the transferee of the delivery; (3) an agreement that the purpose will be fulfilled; and (4) an understanding that the property will be returned to the transferor."
>
> …
>
> On creation of the ordinary bailment, the general property right remains in the bailor, and the bailee has only a special interest in the objects of the express or implied bailment. A bailor with legal title to the subject property retains title if the bailment contract does nothing to change that relationship.

*United States v. $ 500,000.00 in United States Currency*, 591 F.3d 402, 405 (5th Cir. 2009). "A constructive or involuntary bailment arises where the person having possession of a chattel holds it under such circumstances that the law imposes on him the obligations of delivering it to another.'" *Ready Aim Flyer, LLC v. Aviat Aircraft, Inc.*, No. 4:15-CV-2731, 2018 U.S. Dist. LEXIS 239359, at *6 (S.D. Tex. Mar. 7, 2018). Illinois law agrees. *See, e.g.*, *Akiva v. Jurenci*, 2015 IL App (1st) 142977-U, ¶ 44.

Here, the elements of bailment are satisfied with respect to the Settlements. Under CMS rules and regulations often the Provider Agreements are assigned and thus Settlements are delivered to the Buyer after Closing even though the Settlements are "Excluded Assets." As noted above with respect to agency, the express purpose of this relationship was the preservation and

collection of the Settlements, which was to be done at the Tenet Entities' sole direction and for the Tenet Entities' sole benefit. *See* APA § 8.8. Once that purpose was accomplished, the Buyer was obligated to promptly remit the proceeds of the Settlements to the Tenet Entities, as the rightful owners. *See* APA § 8.6. The Buyer accepted this responsibility, creating a bailment relationship with respect to the Settlements and their proceeds. Accordingly, the Settlements were held by Buyer as bailor for the Tenet Entities under the APA, and the beneficial interests were never part of the Defendants' bankruptcy estates.

### c. *Alternatively, Defendants agreed to hold the Settlements in an express trust for the benefit of the Tenet Entities.*

Alternatively, under both Texas and Illinois state law, the APA creates an express trust where the Defendants agreed to hold the Settlements for the exclusive benefit of the Tenet Entities.

Under Illinois law, an express trust exists where there is (1) intent to create a trust; (2) definite subject matter or trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose; and (6) delivery of trust property to the trustee. *In re Marchiando*, 142 B.R. 246, 249 (N.D. Ill. 1992). Under Illinois law,

> No particular formality is necessary in the creation of a trust. It is not necessary that the writing should have been made for the purpose of declaring the trust, but such declaration may be found in a letter or memorandum or writing of the most informal nature. Any agreement or contract in writ[]ing made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person against the person making such agreement.

*Osborn v. Rearick*, 325 Ill. 529, 533, 156 N.E. 802, 804 (1927).[19] Intent to create a trust can be implied from the overall operation of the contract. *Sears v. First Fed. Sav. & Loan Asso.*, 275 N.E.2d 300, 303 (Ill. 1971).

Similarly, under Texas law, a "trust instrument need not contain any particular language to be effective. For an express trust to exist, however, '(1) the words of the settlor ought to be construed as imperative and thus imposing an obligation on the trustee, (2) the subject to which the obligation relates must be certain, and (3) the person intended to be the beneficiary must be certain.'" *Alpert v. Riley*, 274 S.W.3d 277, 286 (Tex. App. -- Houston [1st Dist.] 2008) (quotations omitted]). "[T]echnical words of expression are not essential for the creation of a trust. A trust is a method used to transfer property. Thus, the trustee holds legal title and possession for the benefit of beneficiaries." *Sarah v. Primarily Primates, Inc.*, 255 S.W.3d 132, 145 (Tex. App. -- San Antonio 2008).

If the Court finds that the Tenet Entities delivered the legal title of the Settlements to the Defendants, it is obvious from Section 8 of the APA quoted above that such delivery was not an outright transfer. If the Defendants were not holding the Settlements as agent or bailor, they held the Settlements rights as trustee for the benefit of the Tenet Entities (the beneficiaries). The trust *res* is ascertainable – the Settlements and their proceeds, which were to be promptly remitted upon receipt. The purpose of the trust was to preserve and collect on the Settlements for the benefit of the Tenet Entities.

---

[19] While spend-thrift provisions in a self-settled trust are void against the creditors of the settlor/beneficiary, a trust does not fail simply because it is self-settled. *See, e.g., Rush Univ. Med. Ctr. v. Sessions*, 2012 IL 112906, ¶¶ 41-35, 366 Ill. Dec. 245, 258, 980 N.E.2d 45, 58.

### d. *Alternatively, Defendants held the Settlements in a resulting trust for the benefit of the Tenet Entities.*

If no agency, bailment, or express trust relationship over the Settlements existed on the Petition Date, between the Buyer and the Tenet Entities, a resulting trust did. "A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of." Restat. 2d of Trusts, § 404 (2012).

Under Illinois law, a resulting trust arises where the circumstances surrounding the disposition of property raise an inference, not rebutted, that the transferor does not intend that the person taking or holding the property should have the beneficial interest therein. *See Hong Kong Electro-Chemical Works, Ltd. v. Less*, 539 F.3d 795, 798 (7th Cir. 2008) (quoting *Kaibab Indus., Inc. v. Family Ready Homes, Inc.*, 111 Ill. App. 3d 965 (1983)); *In re Estate of Wilson*, 81 Ill. 2d 349, 355 (1980) ("A resulting trust, characterized as an 'intent enforcing' trust (G. Bogert, Trusts and Trustees sec. 451, at 611 (2d ed. rev. 1977)), is created by operation of law and has its roots in the presumed intention of the parties.").

> "[I]n determining whether a resulting trust has been created, each case is to be decided on its own facts, and the doctrine of resulting trust will be applied wherever the facts are such as clearly to invoke its application. Among other situations a resulting trust has been held to arise where a person comes into possession and control of the property of another [or] where money is placed in the hands of one person to be delivered to another."

*In re Estate of Habel*, 88 Ill. App. 2d 194, 202 (1967) (quoting 89 CJS 940). "The trust is founded upon the natural equity that he who pays for the property should enjoy it, unless he intended by the vesting of title to confer a beneficial interest upon the grantee." *In re Estate of Wilson*, 81 Ill. 2d at 356 (internal quotations and citations omitted). Accordingly, "[a] resulting trust comes into

being at the instant the title vests or not at all." *H.K. Electro-Chem. Works, Ltd. v. Less*, 539 F.3d 795, 798 (7th Cir. 2008).

The law is the same in Texas. *See Nolana Dev. Asso. v. Corsi*, 682 S.W.2d 246, 250 (Tex. 1984) ("A resulting trust is implied in law when someone other than the person in whose name title is taken pays the purchase price, or when an express trust fails.").

Here, to the extent the assignment of the Provider Agreements to the Buyer conveyed legal title of the Settlements to the Buyer, it is obvious from the provisions of the APA cited above that the Buyer does not own the beneficial interests therein. Therefore, to the extent the APA does not create an agency, bailment, or express trust with respect to the Settlements, the Court should hold that the Settlements and their proceeds are subject to a resulting trust.

### e. Alternatively, the Defendants held the Settlements in a constructive trust for the benefit of the Tenet Entities.

If no agency, bailment, express trust, or resulting trust relationship over the Settlements existed on the Petition Date between the Defendants and the Tenet Entities, a constructive trust did.

The APA is clear that the Tenet Entities retained ownership of the Settlements and the Defendants agreed to recognize that ownership by promptly remitting the proceeds of the Settlements. Having failed to do this, any Settlement proceeds held by the Defendants on the Petition Date must be treated by the Court as being held for the Tenet Entities if, under no other theory, then upon the theory of constructive trust.

Under Illinois law:

A constructive trust is created when a court declares the party in possession of wrongfully acquired property the constructive trustee of that property because it would be inequitable for that party to retain possession of it. … When a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it, a constructive trust can be imposed to avoid unjust enrichment. … Although some form of wrongdoing is generally

required for the imposition of a constructive trust …, wrongdoing is not always a necessary element.

*Smithberg v. Ill. Mun. Ret. Fund*, 192 Ill. 2d 291, 299 (2000); *see also Frederickson v. Blumenthal*, 271 Ill. App. 3d 738 (Ill. App. 1995) (imposing constructive trust to preclude nephew from claiming ownership of funds after aunt deposited her money into his savings account, to be held for her benefit); *In re Estate of Engel*, 87 Ill. App. 3d 273 (Ill. App. 1980) (similar facts and same result as *Frederickson*).

Similarly, under Texas law,

A constructive trust is an equitable, court-created remedy designed to prevent unjust enrichment. …. Courts may impose a constructive trust if the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.

*In re Tr. A & Tr. C*, 690 S.W.3d 80, 89 (Tex. 2024) (quotations omitted). However, Texas law requires a breach of a special trust, fiduciary relationship, or actual fraud. *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 210 (Tex. App. 2014).

Section 541(d) plays a unique role with respect to constructive trust rights and resulting trust rights that are not reduced to a judgment prebankruptcy; these rights, being "unperfected" upon bankruptcy, could perhaps otherwise be cut off by the trustee using its strong-arm powers under Section 544(a). In *Cage v. Kang (In re Hojoon Kang)*, this Court has summarized the binding Fifth Circuit precedent in this area, concluding that the superpowers of Section 541(d) apply to protect a third party's true ownership interest in property from being cut off by the bankruptcy process and to prevent a windfall to the debtor. 2013 Bankr. LEXIS 844, at *18 (Bankr. S.D. Tex. Mar. 6, 2013) ("The answer turns on whether the use of § 544(a) would result in the estate benefitting from § 541(d) property the debtor never owned. This may occur, as hypothesized in *Quality Holstein Leasing*, where a debtor's fraud results in the unwitting relinquishment of a true owner's ownership interest. In these examples, the true owner does not intend to transfer ownership

in the property. Assuming state law imposes a constructive trust to protect the true owner, § 541(d) would trump § 544(a).").[20]

Here, both Texas and Illinois law recognize the Tenet Entities' constructive trust rights. Had the Settlements been sold under the APA, there would have been a corresponding increase in the purchase price. But the Settlements were expressly retained by the Tenet Entities. Buyer took possession of the Settlement rights based on a promise to cooperate with, assist in the collection of, and then "promptly remit" the Settlements to the Tenet Entities. Buyer breached this position of special trust. To allow Defendants to retain the funds is wrong and unjustly enriches Defendants. Thus, the elements of a constructive trust are satisfied under both Texas and Illinois law.

### iii.   Regardless of what theory applies, the Tenet Entities owned the beneficial interest in the Settlements and their proceeds on the Petition Date.

The APA could not be clearer that the Tenet Entities retained ownership of the Settlements. To thread the complexities of the CMS rules and regulations, the Tenet Entities delivered the Settlements into the hands of the Buyer. It is irrelevant whether the Buyer's interest in the Settlements was merely possessory or if legal title was transferred, for it is clear that equitable / beneficial title was not transferred. But even if the arguments (under the law of agency, contractual bailment, or express trust) fail, equitable principles intervene and impose a resulting trust, constructive bailment, or constructive trust to prevent the gross inequity of the Buyer obtaining a windfall of property it expressly agreed it did not own. There is accordingly no genuine issue of

---

[20] Notably, the rule in the Fifth Circuit is not universally followed, so reliance on out-of-circuit case law is inappropriate. *See, e.g., XL/Datacomp v. Wilson (In re Omegas Grp.)*, 16 F.3d 1443, 1451 (6th Cir. 1994) ("Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment 'impressing' defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an 'equitable interest' in the debtor's estate existing prepetition, excluded from the estate under § 541(d)."); *Peterson v. Berg (In re Berg)*, 387 B.R. 524, 554 (Bankr. N.D. Ill. 2008) ("The rationale of cases holding that any right to a constructive trust must be established pre-bankruptcy is based on the view that the interest of the bankruptcy trustee, as a hypothetical judicial lien creditor, lien creditor or bona fide purchaser of real property, would be superior to that of any equitable interest granted post-bankruptcy.").

material fact here: the Tenet Entities owned the beneficial interests in the Settlements and their proceeds on the Petition Date and the Court should find in favor of the Tenet Entities in respect of Issue 1.

**B.** **Issue 2: The Tenet Entities have satisfied the requirement to trace the Settlements to property in the hands of the Defendants on the Petition Date.**

To the extent the Settlements were held in trust (express, resulting, or constructive) or subject to an agency or bailment relationship, the equitable interests of the proceeds thereof belong to the Tenet Entities. The Parties have stipulated to all of the facts necessary for the Court to conduct the tracing required under applicable law. The Parties' Stipulation traces each Settlement to a specific Deposit Amount transferred into the Defendants' government lock box accounts and from there transferred into the Defendants' nongovernment lock box accounts. These nongovernment accounts held $292,693.67 and $199,552.84, respectively, on the Petition Date.

Some case law supports the proposition that all of these funds – $492,246.51 ($292,693.67 plus $199,552.84) – are sufficiently traceable to the Tenet Entities' trust property. "[S]o long as trust property can be traced and followed into other property into which it has been converted, the latter remains subject to the trust, and that if a man mixes trust funds with his own, the whole will be treated as the trust property, except so far as he may be able to distinguish what is his own, are established doctrines of equity and apply in every case of a trust relation." *Nat'l Bank v. Ins. Co.*, 104 U.S. 54, 61 (1881); *S. Falls Corp. v. Rochelle*, 329 F.2d 611, 619 (5th Cir. 1964) ("[H]ere the misappropriation is that of money, equitable concepts analogous to 'tracing' do not require identification of precise dollars as they go through various commercial mutation … since South Falls, as one who knowingly misapplied, if not misappropriated bankrupt funds, thereby became an involuntary vicarious fiduciary, the tracing will permeate every asset to the point where this would exhaust the value of all assets as of the date of the turnover order"); *Evans v. Robbins*, 83

B.R. 688, 693 (Bankr. W.D. Mo. 1988) ("[W]here someone deliberately commingles property of the Trustee with other property so that the Trustee cannot identify and trace his property, the Trustee is entitled to the entire commingled mass."); *accord Moody v. Pitts*, 708 S.W.2d 930, 937 (Tex. App. 1986) ("If a trustee commingles trust funds with the trustee's own, the entire commingled fund is subject to the trust.").   Under these principles, all of the funds in the nongovernment accounts were traceable on the Petition Date.

Yet, other cases require more specificity in tracing; if more specificity is required, Courts typically apply the lowest intermediate balance rule ("***LIBR***") to commingled trust funds in a bank account. *See*, *e.g.*, *Tex. Comptroller of Pub. Accounts v. Weathers (In re Vaughn Motors, Inc.)*, 2001 U.S. App. LEXIS 30178, at *6 (5th Cir. Jan. 25, 2001) (unpublished) ("Courts generally apply the lowest intermediate balance rule when trust proceeds are commingled with non-trust proceeds in a debtor's account."); *Int'l Beauty Prods., LLC v. Beveridge (In re Beveridge)*, 416 B.R. 552, 572 (Bankr. N.D. Tex. 2009) ("Courts have held that the lowest intermediate balance test is a suitable method for tracing trust funds that have been comingled with other funds.") (collecting cases); *C. O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 89 Ill. 2d 27, 31-32 (Ill. 1982) ("principles of law and equity" dictates the application of the LIBR when defendant is "likened to the trustee of a constructive trust imposed because he commingled funds"); *Moody v. Pitts*, 708 S.W.2d 930, 937 (Tex. App. 1986) ("When a trustee has commingled funds and has expended funds, the money expended is presumed to be the trustee's own.").[21]

> [T]he lowest intermediate balance rule states that when a trust beneficiary's funds, despite being traceable into the debtor's account, are "commingled in accounts that were drawn upon, the trust beneficiary's recovery [is] limited to the lowest balance between the time of deposit of the [funds] . . . and the filing of the [bankruptcy] petition." The rule is intended to allow a trustee beneficiary to properly trace his or her funds in a commingled account and is "grounded in the

---

[21] Other tracing rules are used in other contexts, such as in Ponzi schemes and widespread frauds.

fiction that, when faced with the need to withdraw funds from a commingled account, the trustee withdraws non-trust funds first, thus maintaining as much of the trust's funds as possible." This rule, however, cuts both ways: if the commingled fund has been reduced "below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account." In other words, the trust beneficiary is "entitled to the lowest intermediate balance, without the benefit of any deposits made after such balance was reached."

*Blackhawk Network, Inc. v. Alco Stores, Inc. (In re Alco Stores, Inc.)*, 536 B.R. 383, 414 (Bankr. N.D. Tex. 2015) (citations omitted).

With respect to bank accounts, courts use the bank's daily ledger balances when determining the lowest balance between the time of the deposit and the petition date. *In re Warren's U-Joint Sales, Inc.*, 1977 U.S. Dist. LEXIS 12902, at *12, 41 A.F.T.R.2d (RIA) 946 (S.D. Tex. Nov. 17, 1977) ("In determining the lowest intermediate balance of the commingled account, the daily closing balance is used . . . [as it] is the one which reflects the actual state of the ordinary commercial bank account, and is the only one accepted and used by both bank and customer in ordinary business transactions."); *Republic Supply Co. v. Richfield Oil Co*., 79 F.2d 375, 380 (9th Cir. 1935) ("No citation of authority is necessary to support the statement that the daily closing balance is the one which reflects the actual state of the ordinary commercial bank account,  and is the only one accepted and used by both bank and customer in ordinary business transactions.").

Tables 1 and 2 of the Stipulation reflect the proper application of LIBR. The tables and Stipulation show CMS deposited each Settlement Deposit Amount into the associated government lock box and reflect that the next business day (the Sweep Date) these funds were swept into the nongovernment lock box accounts. The Tracing Analysis caps each Settlement Deposit Amount by the lowest daily ledger balance between the related Sweep Date and the Petition Date. As additional Settlement trust funds are deposited, those funds were added to the previous LIBR balance, subject to being similarly capped by the lowest daily ledger balance between new

deposit's Sweep Date and the Petition Date. *See* Stip. ¶¶ 2 & 6 (stipulating that the "Lowest Intermediate Ledger Balance" columns reflects the lowest daily ledger balance between the Sweep Dates and the Petition Date). This is a classic and straightforward application of LIBR.

The Tenet Entities urge the Court to hold that all of the funds – $492,246.51 – are sufficiently traceable to the Tenet Entities' trust property.  But if the Court finds that further tracing is required, the Court should hold that LIBR applies, is accurately applied by the Tracing Analysis, and the Defendants held $144,919.63 in traceable Settlement proceeds on the Petition Date.

C.   **Issue 3: The Tenet Entities' post-petition conversion claims are entitled to priority under section 503(b)(1) of the Bankruptcy Code.**

Section 503(b)(1)(A) provides that administrative expenses include "the actual, necessary costs of preserving the [debtor's] estate." 11 U.S.C. § 503(b)(1)(A). "To qualify under § 503(b)(1)(A), an expense must have been of benefit to the estate and its creditors." *In re Sanchez Energy Corp.*, 2021 Bankr. LEXIS 1175, *23 (Bankr. S.D. Tex. May 3, 2021) (citations and quotations omitted) ("The benefit requirement is not an additional element to a § 503(b)(1)(A) claim, but rather a means for testing whether an expense is truly necessary."). Here, the benefit to the estate was direct and immediate – the Debtors had the benefit of money they did not own.

But another way to look at the problem is to view the Defendants' conduct as post-petition conversion. Accordingly, the Parties have stipulated that once Issue 1 and 2 are resolved in the Tenet Entities' favor, the only remaining issue for the Court to decide is whether the post-petition tort of conversion gives rise to an administrative priority under Section 503(b)(1) of the Bankruptcy Code (Issue 3). This is hornbook law.

"As conversion is a tort, a claim based on a post-petition conversion by the debtor-in-possession would be accorded administrative priority as an actual and necessary expense for the privilege of continuing to operate the business." *In re Enron Corp.*, 2003 Bankr. LEXIS 2114, at

25

*16 (Bankr. S.D.N.Y. Mar. 17, 2003); *In re United Puerto Rican Food Corp.*, 41 B.R. 565, 572-73 (Bankr. E.D.N.Y. 1984) ("It is well recognized that conversion is a tort. It is also settled doctrine that tort claims arising during the course of a Chapter 11 proceeding are 'actual and necessary' administrative expenses within the meaning of 11 U.S.C. § 503(b)(1)(A)") (citing *Reading Co. v. Brown*, 391 U.S. 471, 482 (1968)); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 123 (Bankr. D. Del. 2005) (stating that a post-petition tort creates an administrative claim). Accordingly, upon the Court ruling in favor of the Tenet Entities on Issue 1 and Issue 2, the Court should hold that the Tenet Entities' claims are entitled to priority under section 503(b) of the Bankruptcy Code.

## CONCLUSION

The Tenet Entities have demonstrated that under the APA and applicable law, they held, at a minimum, the equitable interests in the Settlements and their proceeds on the Petition Date. The Tenet Entities have traced the proceeds of the Settlements into Defendants' accounts containing $492,246.51 on the Petition Date. If the Court requires any further tracing, LIBR applies and there is $144,919.63 in traceable funds on the Petition Date. Because the Tenet Entities' claims relate to their property held by the Defendants on the Petition Date, their claims are post-petition claims and entitled to administrative priority under Section 503(b) of the Bankruptcy Code. Under the Plan Reservation of Rights, "to the extent that Tenet's claims are later allowed as Administrative Claims, they shall be entitled to payment in full by the Reorganized Debtors in cash in an amount equal to the allowed amount of such claim." Confirmation Order ¶ 118. Accordingly, the Court should enter judgment as a matter of law in favor of the Tenet Entities against the Defendants in the amount of $492,246.51, or alternatively, under the LIBR, $144,919.63, and grant the Tenet Entities such further relief as the Court deems just and proper.

*[Remainder of page left intentionally blank.]*

LEGAL02/45236131v16

Dated:  November 18, 2024

**ALSTON & BIRD LLP**

*/s/ Jared M. Slade*

**JARED M. SLADE**
Texas Bar No. 24060618
S.D. Tex. Bar no. 1813371
2200 Ross Avenue, Suite 2300
Dallas, Texas 75201
T: 214-922-3400
E: jared.slade@alston.com

*and*

**LEAH FIORENZA MCNEILL** (*pro hac vice*)
Georgia Bar No. 940554
**JACOB A. JOHNSON** (*pro hac vice*)
Georgia Bar No. 849407
One Atlantic Center
1201 West Peachtree Street NW
Atlanta, GA 30309
T: 404-881-7000
F: 404-881-7777
E: leah.mcneill@alston.com
E: jacob.johnson@alston.com

*Counsel for Tenet Business Services*
*Corporation and certain affiliates*

LEGAL02/45236131v16

## <u>CERTIFICATE OF SERVICE</u>

I certify that on 11/18/2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Jared M. Slade*
Jared M. Slade

LEGAL02/45236131v16