UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>PIPELINE HEALTH SYSTEM, LLC., *et al*.,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-90291 (MI)<br><br>(Jointly Administered) |
| TENET BUSINESS SERVICES CORPORATION, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>SRC HOSPITAL INVESTMENTS II, LLC, *et al*.,<br><br>Defendants. | Adv. No. 23-03078 (lead case), *consolidated with* Adv. Nos 23-03079, 23-03080, 23-03081 and 23-03082 |

**DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

i

Defendant SRC Hospital Investments II, LLC ("SRC") together with Defendants River Forest Property Holdings, LLC; Weiss MOB Property Holdings, LLC; Weiss Property Holdings, LLC; and West Suburban Property Holdings, LLC (collectively, "Defendants" or "Pipeline") respectfully submit this Statement of Uncontroverted Facts ("Statement") in support of their Motion for Summary Judgment ("Motion") asserting that: (i) the Amended and Restated Asset Purchase Agreement[1] ("APA") between Pipeline and Plaintiff Tenet Business Services Corporation ("Tenet") did not create a bailment, trust, or other fiduciary relationship; (ii) Tenet had no property rights in the Specified Seller Agency Settlements; (iii) Tenet is not entitled to a constructive trust; (iv) Tenet's conversion, declaratory relief, and injunctive relief claims fail as a matter of law; (v) Tenet is not entitled to administrative expense priority; and (vi) Tenet's claims should be disallowed as discharged, general unsecured claims.

A.  **Pipeline's Purchase of the Chicago Hospitals from Tenet**

1. On December 31, 2018, Tenet and Defendant SRC Hospital Investments II, LLC, a subsidiary of debtor Pipeline Health System, LLC,[2] executed an Amended and Restated Asset Purchase Agreement, through which Pipeline intended to acquire various Chicago hospitals and related facilities in Chicago, Illinois, including Louis B. Weiss Memorial Hospital ("Weiss") and West Suburban Medical Center ("West Suburban").[3] On January 28, 2019, Tenet and SRC (Pipeline) executed the First Amendment to Amended and Restated Asset Purchase Agreement

---

[1] Capitalized terms used but not defined herein have the meaning given to them in *Defendants' Motion for Summary Judgment and Memorandum of Law in Support*, filed concurrently with this Statement. Unless otherwise indicated, citations to the electronic case filing docket ("ECF") are to the docket of this adversary proceeding and refer to the corresponding ECF-page numbers. Citations to the docket of the leading bankruptcy case are cited as "Bankr. ECF."

[2] The Motion refers to Pipeline and the defendants collectively and interchangeably as "Pipeline."

[3] Plaintiffs' *Complaint for Conversion, Declaratory Relief, and Turnover of Funds and Application for Injunctive Relief*, ECF No. 1 ("Plaintiffs' Complaint"), ¶¶ 23, 24; *Exhibit A to Plaintiffs' Complaint*, ECF No. 3-1 ("APA"), at 2, 8.

1

(together with the December 31, 2018 Amended and Restated Asset Purchase Agreement, the "APA").[4] The APA governed the sale's terms and conditions and all post-transaction disputes.[5]

2. On January 28, 2019 ("Closing"), Tenet and Pipeline closed escrow, and Pipeline assumed operation of the acquired facilities, including Weiss and West Suburban (together, the "Chicago Hospitals").[6] Pipeline also acquired the Chicago Hospitals' bank accounts including the Weiss "government lockbox" account (Wells Fargo account ending in 0021) and the West Suburban "government lockbox" account (Wells Fargo account ending in 0047), into which government reimbursements were deposited.[7]

**B.    The APA**

3. The APA identified the assets Pipeline was to acquire in the sale, including the real estate, the Accounts Receivable including the government-lockbox bank accounts, and the Chicago Hospitals' Centers for Medicare and Medicaid ("CMS") provider agreements and CMS billing numbers ("MPNs").[8] Pipeline specifically purchased "all Permits, to the extent assignable, held by Sellers relating exclusively to the ownership, development and operation of the Seller Facilities, *including the Medicare and Medicaid provider agreements for the Seller Facilities*."[9]

4. The APA also specified the things Tenet intended not to convey to Pipeline.[10]

---

[4] ECF No. 1, Plaintiffs' Complaint, ¶ 24; ECF No. 3-1, APA, at 197.

[5] ECF No. 3-1, APA, at 8.

[6] *Declaration of Robert Allen in Support of Defendants' Motion for Summary Judgment and Memorandum of Law in Support*, filed concurrently with this Statement ("Allen Decl."), ¶ 4; ECF No. 3-1, APA, at 196.

[7] ECF No. 1, Plaintiffs' Complaint, ¶ 29; *see Second Joint Stipulation of Facts Between Plaintiffs and Defendants*, ECF No. 158 ("Second Fact Stipulation"), ¶¶ 1, 5; Allen Decl., ¶ 5.

[8] ECF No. 3-1, APA, at 8–9 (§ 1.1), at 14–16 (§ 2.1 generally), and at 15 (§§ 2.1(f), 2.1(l)); ECF No. 1, Plaintiffs' Complaint, ¶ 29.

[9] ECF No. 3-1, APA, at 15 (§ 2.1(l)) (emphasis added); ECF No. 1, Plaintiffs' Complaint, ¶ 29.

[10] ECF No. 3-1, APA, at 16–18 (§ 2.2 generally).

Among them, Tenet reserved from the purchased assets its "right" to recover from Pipeline potential future reimbursements from government payors for services Tenet provided prior to Closing.[11] If, after Closing, Pipeline happened to receive one of these reimbursements or another amount "properly due and owing," Pipeline was to "promptly remit" it to Tenet.[12] The APA does not state Pipeline is to receive any specific or identifiable future government reimbursements.[13]

5. The APA also does not state that government payors, such as CMS, would be delivering future reimbursements to Pipeline for safekeeping for Tenet's benefit.[14] The APA also does not contain a provision requiring Pipeline to segregate, earmark, or otherwise identify future funds for Tenet.[15]

6. The APA also appended and incorporated various schedules, including contracts assigned to and assumed by Pipeline.[16] Schedule 3.5 expressly identified the CMS provider agreements and MPNs Pipeline would receive in the sale.[17]

7. Tenet and Pipeline also executed various other agreements alongside the APA, including a Billing License Agreement, which the parties executed to arrange for reimbursement payments Tenet might receive from CMS for services Pipeline rendered pending CMS's approval of the Chicago Hospitals' sale.[18]

---

[11] ECF No. 3-1, APA, at 16, § 2.2(d), at 18, § 2.2(r).

[12] ECF No. 3-1, APA, at 54, § 8.6.

[13] Allen Decl., ¶¶ 6–7 ; ECF No. 3-1, APA, at 54, § 8.6.

[14] Allen Decl., ¶ 7; ECF No. 3-1, APA.

[15] ECF No. 3-1, APA, at 8–9 (§ 1.1, "Accounts Receivable"), at 16, § 2.2(d), at 18, § 2.2(r), at 54, § 8.6; *see* Allen Decl., ¶ 7;

[16] Allen Decl., ¶ 3, Ex. 1 (*Disclosure Schedules to Asset Purchase Agreement by and between SRC Hospital Investments II, LLC and Tenet Business Services Corporation and the Other Sellers Named Herein*, dated July 17, 2018 ["APA Disclosure Schedule"]).

[17] Allen Decl., Ex. 1, APA Disclosure Schedule, at 390 & 396 (Weiss MPNs), 405 & 414 (West Suburban MPNs); *see* ECF No. 3-1, APA at 29, § 3.5.

[18] Allen Decl., ¶ 9, Ex. 2 (*Billing License Agreement*, dated January 28, 2019 ["Billing License Agreement"]) at 1–2, ¶¶ 1–2, 4 ("To the extent Sellers receive any payments of Accounts

3

8.      The APA contains a choice-of-law provision stating any disputes arising out of the APA or its contemplated transactions, including both contract and tort claims, will be governed by the laws of the State of Illinois.[19]

**C.     CMS Reimbursements**

10.     When a provider enters into a provider agreement with CMS, it receives an identifying billing number, called an MPN, or "Medicare Identification Number" or "Provider Transaction Access Number."[20]

11.     To be reimbursed for services, providers must submit billings to a "Medicare Administrative Contractor" (the "Contractor" or "MAC").[21] Each year, the provider submits an annual cost report, which the Contractor uses to reconcile payments against the provider's actual reasonable costs.[22] When the reconciliation shows the provider was underpaid, the Contractor issues a reimbursement to the provider through an electronic funds transfer ("EFT"), and when the provider was overpaid, the Contractor collects payment from provider on behalf of CMS.[23]

12.     National Government Services, Inc. ("NGS") was the Contractor for the State of Illinois and, accordingly, the Chicago Hospitals.[24]

---

Receivable, ***Sellers shall hold any such payments in trust for the benefit of Buyer*** until transferred to Buyer from the applicable bank accounts of Sellers pursuant to this Agreement[.]" Emphasis added.).

[19] ECF No. 3-1, APA, at 69 (§ 11.4) ("This Agreement and *all disputes or controversies* arising out of or relating to this Agreement or the transactions contemplated hereby (*in contract or tort*) *shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of laws principles*." Emphasis added.).

[20] 42 CFR § 424.505; Allen Decl., ¶ 18, Ex. 4 (*Medicare Change of Ownership amended letter from CMS to West Suburban*, dated June 19, 2019 ["West Suburban CHOW"]) at 1; ¶ 17, Ex. 3 (*Medicare Change of Ownership letter from CMS to Weiss*, dated June 19, 2019 ["Weiss CHOW"]) at 1.

[21] Allen Decl., ¶¶ 17–18, Ex. 3, Weiss CHOW, at 1; Ex. 4, West Suburban CHOW, at 1.

[22] Allen Decl., ¶ 12.

[23] Allen Decl., ¶ 12.

[24] Allen Decl., ¶ 13; *Joint Stipulation of Fact* ("Fact Stipulation"), ECF No. 152, ¶¶ 1, 4.

4

13. When a provider undergoes a change in ownership ("CHOW"), the provider agreement between the facility and CMS, as well as the provider's MPN, automatically transfer with the sale to the new owner.[25] CMS is not a party to the CHOW or the hospital sale agreement.[26]

14. Until the CHOW is complete, CMS continues to pay the former owner because CMS has not yet formally approved the new owner's assumption of the MPN.[27] After completion, the MPN and any reimbursements go to the new owner, and CMS only issues payments to the MPN-holding provider.[28] During any interim period, it is up to the buyer and seller to work out payment arrangements for any reimbursements or repayments CMS assesses.[29]

15. Chapter 3 of the Medicare Financial Management Manual states that by accepting assignment, the new owner receives the benefits of assuming the agreement, such as receiving underpayments, and will automatically take the provider agreement subject to "all the terms and conditions under which the existing agreement was issued."[30] CMS has also stated that after a

---

[25] Allen Decl., ¶ 14; Ex. 3, Weiss CHOW, at 1; Ex. 4, West Suburban CHOW, at 1; *Declaration of Kathrynn Benson in Support of Defendants' Motion for Summary Judgment and Memorandum of Law in Support*, filed concurrently with this Statement ("Benson Decl."), Ex. 5 (Excerpts from *Medicare Program Integrity Manual*, Chapter 10 – Medicare Enrollment ["MPIM"]) at 9–10, § 10.6.1.1.1(B), at 11, § 10.6.1.1.2(A)(3)(a) (full version available at CMS.gov, Internet-Only Manuals (IOMs), Publication # 100-08, Medicare Program Integrity Manual, Chapter 10 – Medicare Enrollment, https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/pim83c10.pdf); Ex. 6 (Excerpts from *Medicare Financial Management Manual*, Chapter 3 – Overpayments ["FMM"]) at 6 (§ 130) (full version available at CMS.gov, Internet-Only Manuals (IOMs), Publication # 100-06, Medicare Financial Management Manual, Chapter 3 – Overpayments, https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/fin106c03.pdf).

[26] Benson Decl., Ex. 6 (FMM) at 6, § 130; Ex. 5 (MPIM) at 24, § 10.6.1.1.4.

[27] Benson Decl., Ex. 5 (MPIM) at 24, § 10.6.1.1.4.

[28] Benson Decl., Ex. 6 (FMM) at 6, § 130 ("the new owner receives benefits of assuming the Medicare provider agreement, such as receiving underpayments discovered after the CHOW").

[29] Benson Decl., Ex. 5 (MPIM) at 24, § 10.6.1.1.4 ("It is ultimately the responsibility of the old and new owners to coordinate any payment arrangements between themselves while the contractor and the state are reviewing the CHOW").

[30] Benson Decl., Ex. 6 (FMM) at 6, § 130.

CHOW, the new owner "is the beneficiary of all underpayments," even when the payments are for services rendered by the former owner.[31]

16. Pursuant to the APA and the CHOW, Pipeline expressly assumed and acquired the CMS provider agreements for the Chicago Hospitals, which included the Chicago Hospitals' respective MPNs.[32] Pipeline agreed to reimburse Tenet for those payments that Pipeline received for services Tenet provided prior to Closing.[33]

17. The West Suburban CHOW was completed on or around June 19, 2019.[34] The Weiss CHOW was completed on or around June 27, 2019.[35]

D. **The Settlements and Bank Account Sweeps**

18. After the CHOW was complete, Pipeline began receiving reimbursements for services Tenet had provided.[36]

19. Tenet originally alleged Pipeline did not remit thirteen reimbursement payments for various Weiss and West Suburban cost report years.[37] Tenet has abandoned its claims as to three payments: the Weiss cost report year ending May 31, 2013, the Weiss TRICARE settlement, and the West Suburban TRICARE settlement.[38] There are nine remaining

---

[31] Benson Decl., ¶ 4, Ex. 7 (*Defendants' Reply in Support of Motion to Dismiss or, in the Alternative, Cross-Motion for Summary Judgment* ["CMS Reply"] filed in *Triad at Jeffersonville I, LLC v. Leavitt*, Case No. 1:08-cv-00329-CKK, ECF No. 15) at 23 ("Because one of those conditions is that adjustments are made for overpayments (and underpayments), 42 U.S.C. § 1395g(a), the new owner is responsible for all overpayments (and is the beneficiary of all underpayments) made to the former owner under the provider agreement.").

[32] ECF No. 1, Plaintiffs' Complaint, ¶ 29; ECF No. 3-1, APA, at 15 (§ 2.1(l)); Allen Decl., Ex. 2, Billing License Agreement, at 1–2, ¶¶ 1–2; Ex. 1, APA Disclosure Schedule, at 390 & 396 (Weiss), 405 & 414 (West Suburban).

[33] ECF No. 3-1, APA, at 54 (§ 8.6).

[34] Allen Decl., Ex. 4, West Suburban CHOW, at 1.

[35] Allen Decl., Ex. 3, Weiss CHOW, at 1.

[36] ECF No. 1, Plaintiffs' Complaint, ¶ 32.

[37] ECF No. 1, Plaintiffs' Complaint, ¶ 34.

[38] ECF No. 158, Second Fact Stipulation, ¶ 11.

reimbursement payments at issue in this action: 4 payments to Weiss and 5 payments to West Suburban (the "Settlements").[39]

20. Through a series of deposit account control agreements (the "DACA"), on or about January 28, 2019, Pipeline had arranged for its lender (originally MidCap but became Sector) to "sweep" the Chicago Hospitals' bank accounts.[40]

21. Under the DACA, Sector conducted daily sweeps of the Weiss government lockbox account's ending daily balance into the Weiss nongovernment lockbox account (Wells Fargo account ending in 0039) at the beginning of each business day.[41] Likewise, Sector swept the West Suburban government lockbox account into the West Suburban nongovernment lockbox account (Wells Fargo account ending in 0054) at the beginning of each business day.[42] Then, the following business day, Sector swept the nongovernment lock box accounts into its lender account, at which point the funds were no longer in Pipeline's possession.[43] This process occurred until Pipeline filed for bankruptcy on October 2, 2022.[44]

22. Sector's last sweep of the nongovernmental lockbox accounts took place on Monday, October 3, 2022, the business day after Pipeline filed for bankruptcy.[45] In other words, Sector swept to its lender account the nongovernmental lockbox account balance from Friday,

---

[39] ECF No. 158, Second Fact Stipulation, at 3 (Table 1), 4 (Table 2).

[40] Allen Decl., ¶ 20; Benson Decl., ¶ 5, Ex. 8 (*Transcript of Deposition of Philip Buehner, dated July 19, 2024* ["Buehner Depo."]) at 22:23–24:19; ¶ 6, Ex. 9 (*Transcript of Deposition of Robert Allen, Volume I, dated March 21, 2024* ["Allen Depo."]) at 48:25–51:11.

[41] Allen Decl., ¶ 20.

[42] ECF No. 158, Second Fact Stipulation, ¶¶ 1, 5; Allen Decl., ¶ 20.

[43] Allen Decl., ¶ 20.

[44] Allen Decl., ¶ 20; Benson Decl., ¶ 6, Ex. 9 (Allen Depo.) at 47:21–48:12.

[45] Benson Decl., ¶¶ 7–8, Ex. 10 (*Weiss Nongovernment Lockbox Account bank statements, Wells Fargo Account ending in 0039, filed concurrently herewith under seal* ["Weiss Nongovernment Account No. 0039"]) at REDE Page 579 of 786; Ex. 11 (*West Suburban Nongovernment Lockbox Account bank statements, Wells Fargo Account ending in 0054, filed concurrently herewith under seal* ["West Suburban Nongovernment Account No. 0039"]) at REDE Page 739 of 968.

7

September 30, 2022.[46]

23.     The Settlement amounts NGS deposited into the Weiss government lockbox account and the dates Sector swept the Settlements to the Weiss nongovernment lockbox account are as follows:[47]

| **Weiss Memorial Hospital Settlements** | | | |
|---|---|---|---|
| **Cost Report Period** | **Amount CMS Paid Per Remittance Advice** | **Deposit Amount**[48] | **Sweep Date to Nongovernment Account** |
| 5/31/2014 | $35,735.00 | $297.10 | 2/23/2022 |
| 5/31/2016 | $169,063.00 | $91,653.37 | 6/15/2021 |
| 5/31/2018 | $15,625.00 | $4,980.81 | 8/12/2022 |
| 1/27/2019 | $22,558.00 | $2,648.09 | 8/16/2022 |

24.     The Settlement amounts NGS deposited into the West Suburban government lockbox account and the dates Sector swept the Settlements to the West Suburban nongovernment lockbox account are as follows:[49]

| **West Suburban Medical Center Settlements** | | | |
|---|---|---|---|
| **Cost Report Period** | **Amount CMS Paid Per Remittance Advice** | **Deposit Amount**[50] | **Sweep Date to Nongovernment Account** |
| 4/30/2015 | $76,434.00 | $42,111.85 | 2/8/2022 |

---

[46] Benson Decl., ¶¶ 7–8, Ex. 10 (Weiss Nongovernment Account No. 0039) at REDE Page 579 of 786; Ex. 11 (West Suburban Nongovernment Account No. 0054) at REDE Page 739 of 968.

[47] ECF No. 158, Second Fact Stipulation, at 3 (Table 1).

[48] The Deposit Amount reflects settlement payments, less amounts CMS withheld for other claims. *Joint Stipulation of Facts Between Plaintiffs and Defendants*, ECF No. 152 ("First Fact Stipulation") at 2, n.3.

[49] ECF No. 158, Second Fact Stipulation, at 4 (Table 2).

[50] The Deposit Amount reflects settlement payments, less amounts CMS withheld for other claims. ECF No. 152, First Fact Stipulation, at 3, n.6.

| 4/30/2016 & 4/30/2017 | $264,079.00 | $165,570.67 | 6/10/2021 |
|---|---|---|---|
| 4/30/2018 | $12,781.00 | $9,650.79 | 8/6/2022 |
| 1/27/2019 | $113,966.00 | $1,969.93 | 4/6/2022 |
| 1/28/2019 | $783,963.00 | $361,301.95 | 5/31/2022 |

25. The earliest Settlement sweep was June 10, 2021.[51]

26. The last Settlement sweep was from the Weiss government lockbox account into the Weiss nongovernment lockbox account on August 16, 2022.[52]

27. Under the DACA's terms, Sector swept the Weiss nongovernment lockbox account balance from August 16 to its lender account the following business day.[53]

28. Due to the timing of the daily sweeps and the delays in posting deposits, the Chicago Hospitals' nongovernment lockbox accounts' daily ending balances did not reflect a balance of $0, even though Sector had swept funds from the previous business day.[54] Accordingly, although the nongovernment lockbox accounts reflected non-zero daily balances, those balances are not comprised of any Settlements.[55]

29. On the October 2, 2022 bankruptcy petition date, the Chicago Hospitals' bank accounts did not contain any Settlements.[56]

---

[51] ECF No. 158, Second Fact Stipulation, at 4 (Table 2).

[52] ECF No. 158, Second Fact Stipulation, at 3 (Table 1).

[53] Allen Decl., ¶¶ 20, 22; Benson Decl., ¶ 7, Ex. 10 (Weiss Nongovernment Account No. 0039) at REDE Page 544 (August 16 deposit), REDE Page 552 (August 16 ending daily balance), REDE Page 551 (August 17 debit to Sector account).

[54] Allen Decl., ¶ 20; *see generally* Benson Decl., Ex. 10 Ex. 10 (Weiss Nongovernment Account No. 0039); Ex. 11 (West Suburban Nongovernment Account No. 0054).

[55] Allen Decl, ¶¶ 21–22.

[56] Allen Decl., ¶ 22.

E.   **Bankruptcy and Sale to Resilience**

30.   On October 2, 2022 (the "Petition Date"), Pipeline filed: (i) voluntary petitions under Chapter 11 of the Bankruptcy Code (collectively, the "Petition"), and (ii) a Joint Chapter 11 Plan of Reorganization of Pipeline Health System, LLC and Its Debtor Affiliates, which was amended and supplemented several times in the months that followed (the original Plan of Reorganization, collectively with all amendments and supplements, the "Plan").[57]

31.   As part of the Plan, Pipeline undertook to sell off the Chicago Hospitals.[58]

32.   On November 22, Pipeline filed an emergency motion for an order approving the Chicago Hospitals' sale to AUM Global Healthcare Management Inc. dba Resilience Healthcare ("Resilience").[59] With the emergency motion, Pipeline submitted a Membership Interest Purchase Agreement ("MIPA").[60]

33.   On November 30, the Court approved the sale.[61] On December 2, Pipeline "turned the keys over" to Resilience.[62] Resilience acquired the Chicago Hospitals, the provider agreements and MPNs (and benefits and liabilities), and all email accounts, bank accounts, and records.[63]

34.   On January 13, 2023, the Court entered an Order Approving the Debtors' Second

---

[57] *Lead Bankruptcy Case No. 22-90291* ("Bankr."), ECF Nos. 1, 20, 21; Allen Decl., ¶ 23.

[58] Allen Decl., ¶ 24.

[59] Bankr. ECF No. 534.

[60] Bankr. ECF No. 534-1, at 20.

[61] Bankr. ECF No. 601; Allen Decl., ¶ 25.

[62] Allen Decl., ¶ 25.

[63] Allen Decl., ¶ 25; Bankr. ECF No. 601 at 150, 157, 158, 168 (Schedule 3.1(b)); Benson Decl., ¶ 3, Ex. 6 (FMM) at 26, § 140.6.2 ("If the bankrupt provider sells a facility to another entity and that entity assumes the debtor's provider agreement, any outstanding Medicare underpayments or overpayments regarding that facility should be transferred to the new owner (the purchaser) when the new owner assumes the provider agreement. Although the debtor and the new owner may have a private agreement regarding who is responsible for refunding Medicare overpayments and who should receive any Medicare underpayments, CMS is not bound by such agreements.").

Amended Joint Chapter 11 Plan of Reorganization of Pipeline Health System, LLC and Its Debtor Affiliates (the "Confirmation Order"), confirming the Plan.[64] The Confirmation Order allowed a select few classes of secured and unsecured creditor claims and discharged all others.[65]

35. The Plan designates a "General Unsecured Claim" as one that is not: "(a) paid in full prior to the Effective Date…; (b) an Administrative Claim; (c) an Other Secured Claim; (d) an Other Priority Claim; (e) a DIP Claim; (f) a Term Loan Claim; (g) an ABL Claim; (h) an Intercompany Claim; or (i) a Section 510(b) Claim."[66]

36. The Confirmation Order discharged General Unsecured Claims in their entirety: "On the Effective Date, each General Unsecured Claim shall be discharged and released, and each Holder of a General Unsecured Claim shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claim."[67]

37. Because Tenet does not have a lien on collateral in the bankruptcy and is not a secured creditor, Tenet reserved in the Confirmation Order the right to argue its entitlement to a claim for the Settlements.[68]

38. On February 6, 2023, the Plan went into effect, and Pipeline's debts—except those expressly allowed—were discharged.[69]

39. Per the Plan Reservation of Rights, Tenet filed the instant adversary proceeding on May 10, 2023, alleging claims for conversion of the Specified Seller Agency Settlements,

---

[64] Bankr. ECF No. 1041.

[65] Bankr. ECF No. 1041 at 98–99 (Art. I(A) [defined terms "*Secured Claim*" and "*Unsecured Claim*"]), at 104–106 (Art. III(B)), at 125 (Art. VIII(A)).

[66] Bankr. ECF No. 1041 at 93 (Art. I(A)(81)).

[67] Bankr. ECF No. 1041 at 105 (Art. III(B)(6)).

[68] Bankr. ECF No. 1041, ¶ 118 ("Nothing in the Plan…impairs the rights and claims of Tenet Business Services Corporation and its affiliates ('Tenet')…with respect to Medicare/ Tricare cost report settlements. … This Court shall determine the allowance, amount, and priority of Tenet's claims, if any, against the Debtors or Reorganized Debtors").

[69] Bankr. ECF No. 1104 (incorporating by reference Bankr. ECF No. 1041).

declaratory relief, and injunctive relief.[70]

Dated: November 18, 2024

**CARLSON & JAYAKUMAR LLP**

_/s/ Kathrynn F. Benson_

Keith W. Carlson
    (CA Bar No. 193437 *admitted pro hac vice*)
Lil G. Delcampo
    (CA Bar No. 190055 *admitted pro hac vice*)
Kathrynn F. Benson
    (CA Bar No. 311000 *admitted pro hac vice*)
2424 S.E. Bristol Street, Suite 300
Newport Beach, CA 92660
Telephone:    949-222-2008
Email:    keith@cjattoneys.com
          lil@cjattorneys.com
          kathrynn@cjattorneys.com

*and*

**JACKSON WALKER LLP**
Veronica A. Polnick
    (TX Bar No. 24079148)
Javier Gonzalez
    (TX Bar No. 24119697)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: vpolnick@jw.com
jgonzalez@jw.com

*Co-Counsel for Defendants*

### CERTIFICATE OF SERVICE

    I hereby certify that on November 18, 2024, a true and correct copy of the foregoing was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

                                          _/s/ Kathrynn F. Benson_
                                          Kathrynn F. Benson
                                          *Counsel for Defendants*

---

[70] ECF No. 1, Plaintiffs' Complaint.